Fifth Division
July 28, 2006

No. 1-03-1147


| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 96 CR 30176 |
| | ) | |
| SAMUEL KARIM, | ) | Honorable |
| | ) | Dennis Porter, |
| Defendant-Appellant. | ) | Judge Presiding. |


JUSTICE NEVILLE delivered the opinion of the court:

Following a jury trial, Samuel Karim was convicted of two counts of first degree murder and one count of attempted murder. Karim was sentenced to death. Then - Governor Ryan commuted Karim's death sentence to life in prison. This is the direct appeal of his conviction. Karim presents the following issues for our review: (1) whether the trial court erred when it denied Karim's motion to suppress his written statement, secured after numerous hours of detention in violation of the express terms in the arrest warrant; (2) whether the trial court erred in denying Karim's motion to suppress his identification; (3) whether the trial court erred in denying Karim's motion to dismiss based upon the alleged destruction of and/or failure to preserve evidence; (4) whether Karim was deprived of his right to a fair and impartial jury when he was not permitted to *voir dire* prospective jurors regarding their attitudes toward self-defense; and (5) whether the State's closing argument denied Karim his right to a fair trial.

BACKGROUND

On March 18, 1996, Karim was involved in shootings that resulted in the murders of Jamar Parker and Melvin Harris and the attempted murder of Michael Black. On December 3, 1996, Karim was charged by indictment with: (1) four counts of first degree murder; (2) one count of attempted first degree murder; (3) one count of aggravated battery with a firearm; (4) three counts of armed violence; and (5) three counts of aggravated battery. Karim pled not guilty.

Motions

Prior to trial, Karim filed a motion to suppress a statement he made to the police. That motion was subsequently amended. In the amended motion, Karim argued: (1) that his statement was coerced; (2) that he was interrogated despite requesting the assistance of counsel; (3) that he was threatened with the death penalty and promised that he would receive a 20 - year sentence if he cooperated; (4) that he was kept isolated at the police station for 30 hours despite requesting counsel; and (5) that the police violated the express terms of the arrest warrant.

At the hearing on the amended motion to suppress, attorney Joan Hill McClain (Attorney McClain) testified that she represented Karim in several matters over the years. Attorney McClain testified that, during her representation over the years, she advised Karim of his Miranda rights. Attorney McClain also testified that she repeatedly instructed her client to say nothing more to the police than to give them the name and address of his attorney. According to Attorney McClain, she found out that Karim had been arrested when he called her after he had been taken into custody and held for three days. Attorney McClain testified that she asked Karim why he never called, and he replied that neither the police nor the State's Attorney would permit it. According to Attorney

McClain, when she arrived at the police station, she learned that Karim had given a statement. Attorney McClain also testified that Karim told her that the authorities made promises and threats.

Detective Michael Duffin testified that both he and, later, Assistant State's Attorney Scott Anderson (ASA Anderson) read Karim his <u>Miranda</u> rights. He also testified to the procedures he followed during his investigation. Detective Duffin denied any impropriety in the arrest or detention and claimed that Karim never indicated that he wished to remain silent, was never promised a 20 - year sentence in exchange for his cooperation, was never threatened with the death penalty, and was never handcuffed during the interviews. Detective Duffin also testified that Karim was permitted to use the washroom and was given food during his detention.

Detective Duffin testified that Karim was arrested pursuant to an arrest warrant. Detective Duffin admitted that the warrant expressly commanded that Karim was to be brought before Branch 66 of the circuit court of Cook County located at 26th and California. Detective Duffin also admitted that, despite Branch 66 being open at the time, the arresting officers took Karim to the Area 4 police station for interrogation. Detective Duffin also admitted that the police made no attempt to take Karim to the courthouse the following day until he signed his inculpatory statement. According to Detective Duffin, Karim was arrested on October 31, 1996, at approximately 1:10 a.m. and kept in custody until the afternoon of November 1, 1996.

Detective Duffin testified that Karim was taken to Area 4 to be fingerprinted before being taken to court, which usually takes 12 hours. Despite the express language contained in the arrest warrant, Detective Duffin testified that he decided to search for eyewitnesses while he was waiting for the results of the fingerprinting.

ASA Anderson testified that he told Karim that he was a prosecutor and not his attorney. ASA Anderson also testified that he read Karim his <u>Miranda</u> rights, and at no time did Karim indicate a desire to remain silent. ASA Anderson also testified that Karim never told him of any threats or promises made to induce him to make a statement. After considering the arguments made by both sides, the trial court denied the amended motion to suppress the statement.

Karim also made a motion to suppress the identification testimony based upon the initial identification procedures employed in this case. Karim argued that Michael Black was improperly shown photographs when he could not verbally communicate, due to the insertion of a medical apparatus in Black's throat. Karim also argued that some of the eyewitnesses were permitted to view Karim one-on-one before identifying him. Karim further argued that the lineups were unduly suggestive and that he was never advised that he was entitled to have an attorney present for the lineup.

Detective Joseph Walsh was the only witness to testify at the motion to suppress identification. Detective Walsh testified that he showed photographs to Black, who held Detective Walsh's hand and squeezed his hand to indicate an affirmative response to his yes or no questions. The instruction for giving a negative response was to do nothing. According to Detective Walsh, Black was shown one photograph at a time. Detective Walsh testified that Black squeezed his hand after being shown Karim's photograph.

Karim argued that Detective Walsh's testimony was vague because Detective Walsh testified that he interpreted Black's reaction to viewing the first two photographs as "I think he did not respond at all." Although Detective Walsh made Black initial the back of one of the photographs of

Karim, Karim also argued that the mark was illegible. In addition, Karim argued that it was an improper identification because Detective Walsh never spoke with Black's doctors before conducting it. As a result, Karim argued that Detective Walsh failed to determine if Black was being given any medications that could have affected the results of the identification. Karim further argued that the identification should be considered unreliable because it ended when Black began grunting out loud and squeezing Detective Walsh's hands, which Detective Walsh found "complicated." The trial court also denied the motion to suppress the identification.

Trial

The mothers of the two deceased men, Linda Parker and Paula Harris, testified regarding the last time each mother saw her son alive. Linda Parker testified about how she learned that her son had been killed. Paula Harris testified that she learned of the shooting when she was told that her son was in intensive care at Mount Sinai Hospital. Paula Harris further testified that her son died of his injuries in the hospital on March 23, 1996.

Black testified that he was introduced to Karim in February 1996. According to Black, Karim sold drugs on the west side of the City of Chicago. Black testified that he and Parker were in the business of selling heroin, and that Parker introduced him to Karim, whose nickname was "Red." Black testified that he told Karim that he wanted him to work with them. Black also testified that Karim agreed, was given a quantity of heroin to test and told that he would be contacted.

Black testified that he again spoke to Karim a couple of days later at Parker's house. According to Black, Karim said that he liked the heroin he was given and would be able to move it. Karim, Black and Parker subsequently met on West End, on the west side of Chicago. At this

meeting, Karim was given 50 grams of heroin to sell. Karim was picked up and taken to the Humbolt Park area of the city, where Karim allegedly kept his money. Black and Parker waited in the car while Karim went upstairs. Karim returned with $2,500 of the $5,000 he would have to pay them for the heroin. Black testified that he and Parker gave Karim more heroin. According to Black, they were trying to build a relationship with Karim whereby Karim would handle all of Black and Parker's business.

Black testified that he and Parker received a page from Karim 10 days later. According to Black, Karim reported that he had moved all of their heroin and was ready for more. Black also testified that Karim had the money he owed them. Black testified that he told Karim they would drive over to get the money. Because they had no car, Black and Parker flagged down Harris, who was driving by. According to Black, neither Black nor Parker carried a gun, knife or baseball bat. Black sat in the front passenger seat of Harris's car while Parker sat stretched out in the backseat.

Black also testified that, as the car approached the meeting place, Parker used his cellular telephone to let Karim know they were close. According to Black, Karim was waiting when Black, Parker and Harris arrived. Karim stuck his head in the car and, when asked what was going on, told them to "hold on one second, the shorty got the money." Black testified that he then heard gunshots. When he turned, he saw Karim shoot Parker. Black testified that he tried to get out of the car but was shot 11 times by Karim. According to Black, he fell out of the car and onto the pavement, where he laid as if he was dead. Black testified that, while he laid there, he heard more gunshots, then the sound of a car accelerating away.

Black testified that Lamar Eskridge came to help. Eskridge unbuttoned Black's shirt. The

police arrived shortly thereafter and asked who shot him. Black testified that he told the police that he was shot by "Red," who was a 165-pound, light-skinned, 5-foot-9-inch-tall man. Black also described Karim as wearing a black-hooded jacket and glasses. Black further described Karim as being 21 years old and living in the Humbolt Park area.

Black testified that he was taken from the scene by ambulance to Cook County Hospital. The next day, the police came to the hospital to interview Black. Police detectives showed Black a series of photographs. Black, who was unable to speak as a result of having tubes in his mouth, agreed to answer questions for the detectives by squeezing the hand one of the detectives. Black indicated that Karim was the man who shot him.

On October 31, 1996, Black was brought to the police station to view a lineup. Black testified that he was told about Karim's arrest and told that the police wanted Black to be sure of the identity of the shooter. According to Black, he refused to view Karim from behind a two-way mirror. Black testified that he refused to hide from Karim. Black wheeled his wheelchair in front of Karim and told the detectives that he was wrong. Black testified that Karim then said he did not know Black. Black denied there was an argument in the car while Black, Harris and Parker were waiting for Karim. Black also denied that Parker ever had a baseball bat in his hand. Black also denied that Parker told him the heroin was bad and not selling.

Next, Lamar Eskridge testified that he was working on his cousin's car when he heard gunshots. Eskridge was with his friend, Kewan Stokes, and a mechanic. At the time of shootings, Eskridge testified, there was only a vacant lot between him and sound of the shots. Eskridge testified that he could see a burgundy Cadillac and observed a person run from the driver's side to

the other side of the car. Eskridge testified that a second person fired shots at the first person, who was lying on the ground. Eskridge hid behind the car he had been working on when he heard the shots. Eskridge testified that he watched as the shooter moved within 15 feet of his hiding place. According to Eskridge, the shooter was Karim. Once the shooting stopped, Eskridge testified that Karim got into a car at the end of the block and drove away. It was then that Eskridge went to Black's aid. Eskridge testified that he looked in the car and saw one person in the driver's seat and another person in the backseat. According to Eskridge, he could not tell if they were alive or dead.

The next day Eskridge testified that he and Kewan Stokes went to the Area 4 police station, where Eskridge spoke with Detective Duffin. Detective Duffin showed Eskridge a photo array and he identified Karim as the shooter. Eskridge returned to the police station on October 31, 1996, where he identified Karim a second time.

Eskridge subsequently appeared before the grand jury. Before testifying, Eskridge spoke with an assistant State's Attorney. Eskridge admitted that, when the assistant State's Attorney came to his house, he signed a statement that another man got out of the car as well as the shooter.

Next, Officer John Frank testified that, on the night of the shootings, he was assigned to the rapid response car that received a radio call that shots had been fired. Officer Frank testified that he proceeded to the location along with seven or eight other police cars. At the scene, the police found two men inside a maroon Cadillac, and a third man was lying on the ground beside the car. According to Officer Frank, Black was the man lying next to the car and he was alive and responsive to questions. Officer Frank testified that Black told him that it was "Red" who shot him. Black also told Officer Frank that "Red" lived in Humbolt Park. Officer Frank testified that he used the police

radio to transmit the information about the shooting. Officer Frank admitted that he took no notes about what he had seen at the scene and did not remember seeing a baseball bat in the backseat of the Cadillac. However, Officer Frank acknowledged that a photograph of the backseat of the car clearly showed the baseball bat on the floor on the driver's side.

Next, Detective Joseph Walsh testified that he was working at Area 4 on March 19, 1996. Detective Walsh was assigned to work on the investigation of the shootings from the previous day. Detective Walsh learned that Karim was considered a possible shooter. Detective Walsh testified that he went to the police station to obtain a photograph of Karim. Detective Walsh then tried to interview the two witnesses. Melvin Harris was not available to be interviewed. However, Black was available, so Detective Walsh traveled to Black's hospital. According to Detective Walsh, because Black was unable to speak due to his medical treatment, any questions had to be answered by squeezing hands. Detective Walsh testified that Black identified the shooter when he identified Karim as the person depicted in the photograph. Detective Walsh then asked if the shooting occurred because a debt was owed. Black responded by writing the word "friend" on a piece of paper that it was not. Detective Walsh testified that he terminated the interview when it became clear to him that he needed more specific answers than a simple "yes" and "no."

The next witness was retired forensic investigator John Karalow. Investigator Karalow testified that he arrived on the scene at 6:35 p.m., and he recovered spent bullets and cartridge cases from inside and outside the Cadillac. Investigator Karalow testified that he noted and photographed a baseball bat on the car floor. Investigator Karalow inspected the bat and determined that it lacked evidentiary value because, although it had blood on it, the blood appeared to have dripped on it.

Investigator Karalow testified that he also examined the bat for hair, skin and fiber but found none.

Next, Tonia Brubaker, a forensic scientist and expert in firearms identification, testified that she examined three fired bullets and 10 fired 9-millimeter cartridge casings. Brubaker determined that the three bullets measured nine millimeters and had six lands and grooves and a right-hand twist. According to Brubaker, two of the three bullets had been fired from the same gun. Brubaker testified that she could not determine whether the third bullet was also fired from the same gun. However, Brubaker testified that the shells were all fired from the same Winchester 9-millimeter weapon.

Doctor Joseph Cogan, a forensic pathologist, was the next witness. Dr. Cogan works in the Cook County medical examiner's office. Dr. Cogan was permitted to testify as an expert in forensic pathology. Dr. Cogan testified that he performed Parker's postmortem examination, which revealed an entrance wound to the back of the neck. Dr. Cogan concluded that this wound was not made at close range. According to Dr. Cogan, there was a second wound that was made at close range, having been fired from a distance of no more than 18 inches from the victim. Dr. Cogan concluded that Parker's death was a homicide resulting from multiple gunshot wounds.

Melvin Harris's postmortem examination was performed by Dr. Edmund R. Donohue, whom the trial court also recognized as an expert in the field of forensic pathology. Dr. Donohue testified that Harris had four separate signs of injury, including two gunshot wounds, a large bruise on the right side of his face and a hemorrhage beneath the scalp on the right side of the head. Because he found that both gunshots were fired from a distance of greater than 18 inches from the victim, Dr. Donohue concluded that Harris's death was a homicide.

Detective Michael Duffin testified that he and his partner, Detective Terry O'Connor, were assigned to the shooting. According to Detective Duffin, when they arrived on the scene, they found the maroon Cadillac on the south side of the street facing west. Detective Duffin testified that he saw paramedics providing medical treatment to Black. Detective Duffin also saw a dead man slumped over in the backseat of the car. Detective Duffin testified that he was told by Officer Frank that Harris was in the ambulance and that Black had given a name and description of Karim, whom he knew as "Red." Detective Duffin testified that Detective O'Connor found $570 and some cellular telephones and pagers in the front seat of the car. Both Detectives Duffin and O'Connor traveled to the hospital, where they were able to speak with Black before a tube was placed in Black's throat. Detective Duffin testified that Black told him that Karim lived in a large building near the corner of North Avenue and Humbolt. Detectives Duffin and O'Connor then traveled to Karim's residence, asked around and determined that Karim lived in a basement apartment. Detective Duffin testified that he checked, but Karim was not in his apartment.

Detective Duffin testified that he and Detective O'Connor returned to police headquarters where they spoke with J.J. Parker, a nephew of Parker's. Detectives Duffin and O'Connor then checked the arrest records for a man named Fred Scales. Scales was familiar enough with Karim that he was able to tell the police the names of three persons who might know where Karim was.

Based on this tip, Detectives Duffin and O'Connor drove to the home of Lashaun Pfeifer, who gave them the name of Kena McCoy, and then they went to the home of Tomasina Henderson. During the evening, Detectives Duffin and O'Connor returned to the site of the shooting where they spoke to Derrick Ford, whose nickname was also "Red." Ford did not fit the description of the

shooter given by anyone involved in the case. Detectives Duffin and O'Connor returned to police headquarters, where they received a phone call from Kena McCoy, who gave them "Red's" name as Karim. Detectives Duffin and O'Connor tried unsuccessfully to get a photograph of Karim from their files. Detectives Duffin and O'Connor then tried unsuccessfully to find Karim's girlfriend, whose nickname was "Pooh." Detectives Duffin and O'Connor then turned the investigation over to Detective Joe Walsh.

On October 31, 1996, at approximately 1:10 a.m., Karim was arrested by Detectives Duffin and O'Connor. The tip leading to the arrest came from "Pooh," who indicated that Karim would be at a home at 15th and Harding. Detectives Duffin and O'Connor did a search incident to the arrest and found an identification card indicating that Karim's name was Michael West and that he lived in Houston, Texas. Karim was brought to the Area 4 police headquarters and placed in an interview room on the second floor. Detectives Duffin and O'Connor met with Karim at approximately 2 a.m., about 50 minutes after he was taken into custody. Detective Duffin testified that he and Detective O'Connor introduced themselves to Karim and read him his Miranda rights. According to Detective Duffin, Karim stated that he was willing to answer questions. Detective Duffin testified that Karim admitted his correct name but denied any participation in the murders. Detective Duffin returned Karim to the lockup where he was fingerprinted and allowed to make a telephone call. This occurred at approximately 3:30 a.m., and Karim had been in custody for approximately 2 ½ hours. According to Detective Duffin, it was necessary to wait anywhere from 12 to 36 hours to receive confirmation of a fingerprinted suspect's identity.

Detective Duffin also testified that, at some point between 7 and 7:30 p.m., Eskridge came to

the police station to view the lineup and he identified Karim. At that point, Karim had been in custody for approximately 18 hours. At approximately 8:45 p.m., Michael Black also viewed a line-up. At that point, Karim had been in custody for approximately 19 hours. After the completion of both lineups, Detective Duffin testified that he telephoned the felony review office. At approximately 10:30 p.m., ASA Anderson arrived at the violent crimes office. At that point, Karim had been in custody for approximately 21 hours.

Detective Duffin testified that ASA Anderson first spoke with the detectives and then with the witnesses. According to Detective Duffin, he and ASA Anderson met with Karim at approximately 1:30 a.m., November 1, 1996. At that point, Karim had been in custody for over 24 hours. Detective Duffin testified that ASA Anderson introduced himself and explained that he was not there to act as Karim's lawyer. ASA Anderson read Karim his Miranda rights. According to Detective Duffin, Karim indicated that he understood his rights and was willing to have a conversation. Detective Duffin testified that Karim again denied any participation in the murders. Although he had previously denied knowing the victims, Karim told ASA Anderson that he did know them.

Detective Duffin testified that ASA Anderson concluded the interview with Karim, then asked the detectives to try to locate other witnesses. According to Detective Duffin, they were unsuccessful and returned to headquarters, where another conversation with Karim took place. This conversation occurred at approximately 5 a.m., November 1, 1996. At this point, Karim had been in custody for approximately 28 hours. During this conversation, Karim admitted that he shot Black, Parker and Harris.

Once Karim admitted shooting the victims, ASA Anderson testified that he gave Karim three options as to how his statement could be memorialized. ASA Anderson testified that Karim's options included: (1) it could be done orally; (2) in a handwritten summary; or (3) made before a court reporter who would take the statement down verbatim. According to ASA Anderson, Karim chose the handwritten option. ASA Anderson testified that the statement was taken and reduced to summary form. Karim was given an opportunity to review and correct the statement, after which it was signed.

ASA Anderson testified to the contents of Karim's statement. According to ASA Anderson, Karim received heroin from someone he knew as J.D. J.D. told Karim that he was to sell the heroin, but that J.D. could get Karim a couple of grams to test out. Karim gave the heroin to an addict to get an opinion as to the quality of the drugs. Because the heroin was good, Karim thereafter told J.D. that he wanted 75 or 100 grams. Karim was told how much the drugs would cost him. Karim attempted to raise the money but was only able to come up with enough to buy 50 grams. J.D. told Karim that he did not want to break up the 75 grams so he would take the money for the 50 grams and give him the remainder on consignment. J.D. and Karim agreed to meet to make the purchase. Karim took the drugs and divided it into smaller amounts for sale. According to Karim's statement, the drugs were no good, the buyers complained, and they refused to buy any more from him.

According to Karim's statement, when J.D. called to get the balance owed for the heroin, Karim told him the drugs were not selling and that he wanted his money back. J.D. declined to give a refund and began calling every other day to get the money Karim owed him. Karim refused to pay because of the quality of the heroin. According to Karim's statement, on March 17, 1996, he and

J.D. agreed that Karim would return the remainder of the drugs. On March 18, 1996, when J.D. paged Karim demanding the money, Karim told him to come and get the rest of the drugs. According to Karim's statement, J.D. agreed to come to pick up the remainder of the drugs.

According to Karim's statement, Karim then drove to the location of the shooting and parked his car. Karim then walked through a vacant lot to West End, where he entered a house. Later, Karim got the call that J.D. was waiting outside. When Karim arrived at the scene, he found three men in a burgundy Cadillac. Karim knew the man in the passenger seat as Mohammed and the man in the backseat as J.D. Karim did not know the driver.

According to Karim's statement, he walked to the rear driver's side door and opened it. J.D. said he wanted his money. Then Mohammed said "come on Red. No one else complained." Then J.D. got out of the car, again demanded his money, then got back into the car. Karim called for Scotty, his security man. According to Karim's statement, Scott pointed a Glock 9-millimeter gun containing 19 bullets at the rear window. According to Karim's statement, the gun belonged to Karim and was loaded. Karim heard the driver say that Scott had a gun as he tried to put the car in gear. Karim grabbed the gun from Scott and began shooting at the back of the driver. According to Karim's statement, he shot at the driver at least twice, then turned the gun on Mohammed. Karim shot him. According to Karim's statement, he then shot at J.D. three or four times. Karim never saw J.D., Mohammed or the driver with guns or weapons.

According to Karim's statement, he turned the gun over to Scott and fled. Karim drove home and packed a bag. Then Karim traveled to a Best Western in Maywood and then to California, where he stayed for a month. Karim then moved around between New York, Chicago, Ohio and

Houston before returning to Chicago on October 25, 1996.

Karim testified that he was in the business of selling drugs. Karim testified that, by 1996, he had been selling heroin for approximately five years, usually consisting of drugs purchased from a few different sources. Karim testified that he had a group of teenagers working for him. Karim also testified that he kept guns for protections, including 9-millimeter guns. Karim was planning to acquire surplus heroin, beyond the amount he obtained from his regular suppliers, Parker and Black. Karim testified that he contacted Parker in order to purchase 50 grams of heroin. Because Parker did not want to split up his supply of 75 grams of heroin, a deal was made by which Karim would pay for 50 grams and receive an additional 25 grams on consignment. According to Karim, the exchange of money for drugs took place without a problem. Karim testified that he began selling the heroin the next day, but people complained that it was cut too much. Karim testified that he took the heroin to some of his regular customers, who all told him it was bad stuff. Karim testified that he called Parker to complain about the heroin but Parker refused to listen. Karim told Parker that he would not pay unless Parker provided him with better heroin. According to Karim, he and Parker argued on the phone repeatedly for a couple of weeks but achieved no resolution of the dispute. Eventually, it was decided that Karim and Parker should meet to resolve the situation.

Karim testified that he drove to the meeting location, parked his car nearby and walked through a vacant lot to a nearby house. Karim took a phone call shortly after he arrived at the house. The call was from Parker, who told Karim he was in a car out front. Karim went downstairs with his friend Scott, whom he told to watch out for him. Karim testified that he went to the car and opened the rear driver's side door and got in the car. Parker was in the backseat, Mohammed was in

the front seat and Harris, whom Karim did not know, was in the driver's seat. An argument ensued. Harris attempted to start the car, causing Karim to panic because he did not know what Parker, Black and Harris were going to do. Karim saw a baseball bat on the floor in the back of the car. Karim called to Scott to "up that thing." Scott ran to the car and "upped" the gun. Karim snatched the gun from Scott and started shooting. Karim claimed that Parker had the bat in his hands and he did not know if either Parker, Harris or Black was armed. Karim testified that he knew they knew where he lived. Karim tried to run to the other side of the car, but when he saw Black trying to jump out, Karim shot him. Karim testified that he was trying to get out of the car the first time he shot Black. At that point, Karim noticed that Parker was fumbling in the backseat, so he shot him. Karim testified that he ran across the street and handed the gun to Scott. Karim went home, packed a bag, went to a Maywood hotel, and fled the jurisdiction the next day. Karim also testified that he thereafter contacted his attorney, who advised him to turn himself in. Karim testified that he returned to Chicago in October, fully intending to turn himself in but he was arrested when he went to visit his kids.

Karim testified that he was taken to the police station, where he was taken to a room on the second floor. Karim stated that he asked to speak with his attorney, but was not allowed to make a call. The police then moved him downstairs, where he was kept in the lockup for approximately five more hours. During this period of his detention, Karim stated the police detectives told him that he was facing either natural life or the death penalty. Karim testified that he was returned to the lockup where he remained until it was time for him to be part of a lineup. After the lineup, Karim was taken back to the interrogation room. Karim told them he wanted to speak with an attorney. According to

Karim, he decided to speak with the police after Detective Duffin told him he was facing death or natural life and that he could work something out and get a 20-year sentence. Karim also testified that, when he spoke with ASA Anderson, he was again told that he could get a 20-year sentence in exchange for his cooperation. Karim was then presented with a copy of the summary of his statement, which he reviewed and signed. According to Karim, he only read the first page of his statement. In the statement, Karim said there were no weapons in the car but that did not include the baseball bat.

Following closing arguments and instructions, the jury found Karim guilty of: (1) the first degree murder of Melvin Harris; (2) the first degree murder of Jamar Parker; and (3) the attempted first degree murder of Michael Black.

### ANALYSIS

### Motion To Suppress Statement

Karim does not dispute any of the trial court's findings on the motion to suppress. However, Karim argues that the length of time he spent at the police station rendered his statement involuntary. Karim was 19 years old at the time of his confession. He dropped out of high school after only two days, never having completed high school or having obtained a GED. Karim argues that his lack of education and repeated use of drugs and alcohol contributed to the alleged involuntariness of the statement under the circumstances. Karim also argues that the length of his detention should weigh heavily in his favor. Karim argues that the State gave no satisfactory explanation as to why he was kept at Area 4 when the arrest warrant instructed the police to bring him to court. Additionally, Karim argues that he was held for approximately 36 hours and subjected to multiple interrogations

before he confessed.  Karim argues the statement is devastating to his defense and was wrongfully

obtained.  According to Karim, the State's only eyewitness was Black.  Karim argues that Black's

testimony is tainted by serious credibility problems, including the fact that Black was serving time

for drug trafficking – for which he was granted immunity before he testified.  Karim argues that

Black was a known heroin dealer,  who had been shot 11 times and was confined to a wheelchair.

Karim characterizes Black as a liar.

Karim also argues that Eskridge, the State's other eyewitness, was less than credible because

he did not look at the scene until after he heard the gunfire.  Karim argues that Eskridge took cover

after he heard those shots.  Karim also argues the substances of Eskridge's identification testimony is

highly improbable.

The State argues that the inculpatory statement was voluntary.  According to the State, the

voluntariness of the statement was determined after the trial court considered all the relevant factors.

 First, the State argues that Karim admitted his guilt after only 28 hours, which is not excessive per

se.  Second, the State argues that Karim was of adequate age as well as adequate experience with

both criminal matters in general and Miranda in particular so as to know his rights.  Third, the State

argues that Karim was fed, given bathroom breaks when needed and was allowed to smoke.  Fourth,

the State argues that, although the total amount of time was arguably long, Karim was only

interrogated for a total of 90 minutes during his detention and was returned to lockup when he was

not being interrogated.

Alternatively, the State argues that Karim has accepted as true the trial court's findings: (1)

that the duration of the detention was not excessive; (2) that Karim never asked for an attorney; (3)

that Karim never indicated that he wished to remain silent; and (4) that Karim was never told he would get a 20-year sentence in exchange for his cooperation. Accordingly, the State argues that Karim should not now be allowed to argue a position that is inconsistent with the trial court's findings.

Finally, the State argues that Karim willingly cooperated from the beginning of his interview and that the cooperation continued throughout his prearraignment detention. The State further argues that any delay was shown to be necessary for the police to complete the investigation. According to the State, the lineup identifications were necessary to justify the decision to charge Karim.

In order to rule on a motion to suppress a defendant's statement, a trial court must determine: (1) the credibility of the witnesses; (2) the weight to be given to the witnesses' testimony, and (3) the inferences to be drawn from the evidence. People v. Ballard, 206 Ill. 2d 151, 162 (2002), citing People v. Galvin, 127 Ill. 2d 153, 163 (1989). Accordingly, when we review a trial court's decision on a motion to suppress, the ruling will only be overturned if it is manifestly erroneous. Ballard, 206 Ill. 2d at 162, citing Galvin, 127 Ill. 2d at 162; People v. Evans, 125 Ill. 2d 50, 78 (1988). "'Manifestly erroneous means arbitrary, unreasonable and not based on the evidence.'" Ballard, 206 Ill. 2d at 162, quoting People v. Wells, 182 Ill. 2d 471, 481 (1998). However, when neither the facts nor the credibility of the witnesses is challenged, we conduct a *de novo* review. People v. Nielson, 187 Ill. 2d 271, 286 (1999), citing People v. Williams, 181 Ill. 2d 297, 309 (1998). Here, Karim challenges both the credibility of witnesses and the trial court's interpretation of facts. Therefore, we review the trial court's ruling to determine if it was manifestly erroneous.

When a defendant makes a statement, we must determine whether that statement was voluntary. People v. Willis, 215 Ill. 2d 517, 519 (2005). " 'A voluntary confession by a competent person of the guilt of a crime is the highest type of evidence – an involuntary confession obtained by brutality or coercion is wholly unreliable and is the most flagrant violation of the principles of freedom and justice. The decisions of this court have always been guided by these principles and until some sound reasoning appears showing a better test for the admissibility of confessions we shall adhere to those principles.' " Willis, 215 Ill. 2d at 535, quoting People v. Hall, 413 Ill. 615, 623-24 (1953), and quoting Culombe v. Connecticut, 367 U. S. 568, 602, 6 L. Ed. 2d 1037, 1057-58, 81 S. Ct. 1860, 1879 (1961) (" ' The ultimate test [for admissibility] remains that which has been the only clearly established test in Anglo-American courts for two hundred years:  the test of voluntariness.  Is the confession the product of an essentially free and unconstrained choice by its maker? ' ").

In Willis, our supreme court held that "[t]o determine whether the defendant's confession was voluntary, [courts must] consider the totality of the circumstances surrounding it, including the defendant's age, intelligence, education, experience, and physical condition at the time of the detention and interrogation; the duration of the interrogation; the presence of Miranda warnings; the presence of any physical or mental abuse;  and the legality and duration of the detention." Willis, 215 Ill. 2d at 536, citing Ballard, 206 Ill. 2d at 177, citing People v. Gilliam, 172 Ill. 2d 484, 500-01 (1996).

It is well established that "a judicial determination of probable cause must precede an 'extended restraint of liberty following arrest.' " Willis, 215 Ill. 2d at 526, quoting Gerstein v. Pugh,

420 U.S. 103, 114, 43 L. Ed. 2d 54, 65, 95 S. Ct. 854, 863 (1975).  Willis explains that Gerstein left open the question of how long the delay could take before the police must present a defendant before a magistrate, "provided [states] afford a fair and reliable judicial determination of probable cause either before or 'promptly' after an arrest." Willis, 215 Ill. 2d at 526, quoting Gerstein, 420 U.S. at 125, 43 L. Ed. 2d at 71-72, 95 S. Ct. at 868-69.

The United States Supreme Court defined "promptly" in County of Riverside v. McLaughlin, 500 U.S. 44, 114 L. Ed. 2d 49, 111 S. Ct. 1661 (1991).  In McLaughlin, the Supreme Court stated:

"Our task in this case is to articulate more clearly the boundaries of what is permissible under the Fourth Amendment. Although we hesitate to announce that the Constitution compels a specific time limit, it is important to provide some degree of certainty so that States and counties may establish procedures with confidence that they fall within constitutional bounds.  Taking into account the competing interests articulated in Gerstein, we believe that a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of Gerstein.  For this reason, such jurisdictions will be immune from systematic challenges." (Emphasis added.)  McLaughlin, 500 U.S. at 56, 114 L. Ed. 2d at 62-63, 111 S. Ct. at 1670.

Although McLaughlin set the clock at 48 hours, it also recognized that there can exist

circumstances where a detention of less than 48 hours can nonetheless violate <u>Gerstein</u> if a defendant can prove unreasonable delay. <u>Willis</u>, 215 Ill. 2d at 527. <u>Willis</u> gives examples of unreasonable delay: (1) delay to allow the police time to gather additional evidence to justify retroactively the defendant's arrest; (2) delay to show ill-will toward the defendant; or (3) delay for its own sake. <u>Willis</u>, 215 Ill. 2d at 527, citing <u>McLaughlin</u>, 500 U.S. at 56, 114 L. Ed. 2d at 63, 111 S. Ct. at 1670. In short, <u>McLaughlin</u> provides that "[w]here an arrested individual does not receive a probable cause determination within 48 hours, the calculus changes. In such a case, the arrested individual does not bear the burden of proving an unreasonable delay. Rather, the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance." <u>McLaughlin</u>, 500 U.S. at 57, 114 L. Ed. 2d at 63, 111 S. Ct. at 1670.

Karim was arrested pursuant to a warrant issued upon a showing of probable cause. The warrant provided that Karim was to be taken <u>instanter</u> to the trial court at Branch 66. The police did not comply with the warrant in that respect. Instead, Karim was detained at the Area 4 police station. Karim confessed during that detention, still within the 48-hour window created by the combination of <u>Gerstein</u> and <u>McLaughlin</u>. Therefore, the question becomes whether the 30-hour delay was too long.

Although it was interpreting the promptness of presentment under our statutory scheme, we find the discussion in <u>Ballard</u> to be instructive. Section 109-1(a) of the Code of Criminal Procedure of 1963 requires presentment before a judge "without unnecessary delay." 725 ILCS 5/109-1(a) (West 1996). <u>Ballard</u> holds that "noncompliance [with the 'without unnecessary delay' provision in the statute] does not, by itself, obviate a confession or render an otherwise voluntary confession

inadmissible at trial.  Rather, such delay is merely a factor to be considered on the question of voluntariness."  Ballard, 206 Ill. 2d at 176, citing People v. House, 141 Ill. 2d 323, 380 (1990), and People v. Brooks, 51 Ill. 2d 156, 164-65 (1972).  Although Karim's warrant used the word "instanter", the guiding principle is, and should remain, that "[p]resentment to a judge need be performed only with such reasonable promptness as the circumstances permit."  Ballard, 206 Ill. 2d at 177.  According to Ballard, "[w]hether there was or was not unnecessary delay must be determined from all the facts and circumstances of each case."  Ballard, 206 Ill. 2d at 177, citing People v. Jackson, 23 Ill. 2d 274, 278 (1961).  We believe the word "instanter" should be treated like the words "without unnecessary delay" were treated by the supreme court in Ballard.  Ballard, 206 Ill. 2d at 177-78 ("a delay of 24 to 36 hours prior to presentment is usually not considered to be unnecessary").

Ballard also holds that, when a defendant is in lawful custody, has made a knowing waiver of his or her rights under Miranda, and indicated a willingness to talk to police, the question becomes whether a voluntary statement can be rendered involuntary based on delay.  Ballard, 206 Ill. 2d at 178.  The Ballard court was unwilling to permit a legislative directive to deprive the police of "'reasonable latitude to fully investigate a crime.'"  Ballard, 206 Ill. 2d at 178, quoting Jackson, 23 Ill. 2d 274, 280 (1961).

In this case, the State explained the delay in presenting Karim to the trial court as being time that was needed to confirm Karim's identification by fingerprints and by the eyewitnesses.  According to the State, the delay was also necessary because it gave the police time to confirm Karim's identification as the shooter through lineup identifications.  During this delay, still well

within the time frame outlined in <u>Willis</u>, <u>Ballard</u>, <u>Gerstein</u> and <u>McLaughlin</u>, Karim gave his statement. The trial court considered all the relevant factors and declined to suppress the confession. Karim does not dispute most of the trial court's factual findings. This includes the trial court's finding that Karim understood his rights on the date of his arrest because "the defendant underst[ood] his <u>Miranda</u> rights [and had] no mental condition preventing him from doing that." The trial court also found that Karim never asked for an attorney, never said he wanted to remain silent, was never told he would get a 20-year sentence in exchange for his cooperation, and was never threatened with the death penalty. The trial court further found that Karim was given food and drink, allowed access to bathroom facilities and given the opportunity to smoke. By accepting most of the trial court's findings, Karim has limited himself to the issue of the time-delay, which is not <u>per se</u> excessive. <u>Ballard</u>, 206 Ill. 2d at 177-78. Therefore, the trial court's decision not to suppress the statement was not manifestly erroneous. <u>Ballard</u>, 206 Ill. 2d at 162.

Motion To Suppress Identification

Next, Karim argues that the trial court erred in denying his motion to suppress his identification. Karim argues that the identification was improper because it was obtained under circumstances that were too subjective and highly unorthodox and, therefore, unreliable.

The State argues that there can be no prejudice because Karim admitted guilt. The State also argues that Black's identification was not the only one in this case, making any error harmless beyond a reasonable doubt. Black knew Karim. Eskridge's testimony was corroborated by Black. The State argues that there was no question as to Karim's identity. The State further argues that, because he argued a self-defense theory of innocence at trial, Karim should not be allowed to make

1-03-1147

identity an issue.

As we previously established, we review the trial court's decision denying the defendant's motion to suppress the identification to determine if that ruling was manifestly erroneous. Ballard, 206 Ill. 2d at 162, citing Galvin, 127 Ill. 2d at 162.

It is well established that the identification of the defendant by a single witness is sufficient to sustain a conviction provided the circumstances surrounding the witness's viewing of the defendant permitted a positive identification. People v. Austin, 328 Ill. App. 3d 798, 804 (2002). A trier of fact must consider the following in order to properly assess the reliability of identification testimony: (1) "the opportunity for the witness to view the perpetrator at the time of the incident; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description; (4) the level of certainty of the witness at the subsequent identification; and (5) the length of time between the crime and the identification." People v. Pearson, 324 Ill. App. 3d 622, 626 (2001), citing Slim, 127 Ill. 2d at 307-08.

The United States Supreme Court has recognized that there are hazards in photographic arrays. In Simmons v. United States, the Supreme Court held:

> "It must be recognized that improper employment of photographs
> by police may sometimes cause witnesses to err in identifying
> criminals. A witness may have obtained only a brief glimpse of a
> criminal, or may have seen him under poor conditions. Even if the
> police subsequently follow the most correct photographic
> identification procedures and show him the pictures of a number of

individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized. The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime. Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification." Simmons v. United States, 390 U. S. 377, 383-84, 19 L. Ed. 2d 1247, 1253, 88 S. Ct. 967, 971 (1968).

Although Karim would have us dismiss the identification based on the fact that Black was unable to speak when the photograph was shown to him, he ignores the fact that he and Black were well-acquainted with each other. The two men were doing business together and had met previously. Black initially told the police that he was shot by "Red," of whom Black was able to provide an accurate description. Black subsequently identified Karim as "Red" both at the photographic lineup and later at trial. Although the hand-squeezing method of photographic

identification is admittedly unusual, it was hardly inappropriate given the fact that Black was a hospitalized gunshot victim. "For identification evidence to be inadmissible, a defendant must meet the burden of proving that the identification procedures were 'so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law.' " People v. Miller, 254 Ill. App. 3d 997, 1003 (1993), quoting People v. Blumenshine, 42 Ill. 2d 508, 511 (1969). "Whether due process has been violated in a particular case depends on the totality of the circumstances surrounding the identification." Miller, 254 Ill. App. 3d at 1003, citing Stovall v. Denno, 388 U.S. 293, 302, 18 L. Ed. 2d 1199, 1206, 87 S. Ct. 1967, 1972 (1967).

Although the admission of identification evidence violates a defendant's due process rights where there is "a very substantial likelihood of irreparable misidentification" (Neil v. Biggers, 409 U.S. 188, 198, 34 L. Ed. 2d 401, 410-11, 93 S. Ct. 375, 381-82 (1972)), this is simply not such a case. The evidence does not support Karim's claim of misidentification because, in addition to Black, who was Karim's business associate, Karim was identified by Eskridge using the same photographic array. Not only did two witnesses identify Karim as the shooter, Karim gave his statement to the police admitting guilt. The totality of these circumstances supports the State's position that there was no violation of due process and no misidentification. Miller, 254 Ill. App. 3d at 1003. Therefore, the trial court's decision denying the motion to suppress the identification was not manifestly erroneous.

Motion To Dismiss: Failure To Preserve Evidence

Next, Karim argues that the trial court erred in denying his motion to dismiss based on the alleged destruction of and/or failure to preserve evidence. Karim argues that the police found a

bloody baseball bat while processing the evidence at the crime scene but failed to preserve it as evidence. Karim made a motion before the trial court to preserve the baseball bat. The State did not object to that motion. Karim filed a motion to dismiss based on the State's failure to preserve the bat, the importance of which should have been obvious to the State. Karim argues that his theory before the trial court was that the bat was used in a threatening manner and caused him to act in self-defense by shooting the gun. Karim argues that the failure to preserve the bat prevented him from proving that the bat was wielded in a threatening manner by Parker, Black or Harris. Karim further argues that the State's failure to preserve the bat should have been treated as a discovery violation.

The State argues that the police examined the bat at the scene and did not recover it because the police determined the bat had no evidentiary value. According to the State, the car and its contents were returned to its owner six months before Karim's arrest. The motion for discovery was filed nine months after the murders and two months after Karim's arrest. Karim filed the motion to preserve and produce the bat for forensic testing over four years after the indictment. Thereafter, Karim filed the motion to dismiss. Karim argued that the importance of the bat should have been obvious to the violent crimes detectives and that its disposal was done in bad faith. The trial court denied the motion to dismiss, finding no hint of bad faith. The State argues that the trial court was correct, since a forensic expert testified that the bat was examined but yielded no evidence.

The State argues that Karim cannot meet his burden of showing actual prejudice. The State argues the presence of the bat is well documented. It was photographed and those photographs were shown to the jury. The State argues that the claim that Karim was afraid the bat would be used against him was corroborated to the extent that it existed. However, the State argues the bat had no

evidentiary value. Although Karim argues that he wanted to test it for fingerprints or DNA, he failed to allege whose fingerprints or DNA he expected to find.

As to a self-defense claim, the State argues that Karim never testified to seeing bloodstains on the bat, which would have suggested that it had been used in the past as a weapon. The State also argues that, by his own admission, Karim did not start shooting because any of the victims reached for the bat. The State argues that Karim's testimony was that he started shooting when Harris started the car.

Karim contends that the State violated its constitutional obligations under Brady v. Maryland, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). Brady and its progeny obligate the State to disclose exculpatory evidence to the defense. Brady, 373 U.S. at 87, 10 L. Ed. 2d at 218, 83 S. Ct. at 1196-97 ("the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution"). "Such evidence is material if there is a reasonable probability that the result of the defendant's trial would have been different had the evidence been disclosed to the defense." People v. Thomas, 364 Ill. App. 3d 91, 101 (2006), citing People v. Harris, 206 Ill. 2d 293, 311 (2002). "A reasonable probability of a differing result is one that is sufficient to undermine confidence in the trial's actual outcome." Thomas, 364 Ill. App. 3d at 101, citing People v. Hobley, 182 Ill. 2d 404, 433 (1998); People v. Coleman, 183 Ill. 2d 366, 393 (1998) (appellant must show that the favorable evidence would undermine confidence in the verdict).

In Arizona v. Youngblood, 488 U.S. 51, 102 L. Ed. 2d 281, 109 S. Ct. 333 (1988), the United

1-03-1147

States Supreme Court addressed the failure to preserve evidence that is only potentially useful. Youngblood holds:

"The Due Process Clause of the Fourteenth Amendment, as interpreted in Brady, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant. Part of the reason for the difference in treatment is found in the observation made by the Court in [California v. Trombetta, 467 U.S. 479, 486, 81 L. Ed. 2d 413, 421, 104 S. Ct. 2528, 2532 (1984)], that ' [w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed.' " Youngblood, 488 U.S. at 57-58, 102 L. Ed. 2d at 289, 109 S. Ct. at 337.

Youngblood holds that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Youngblood, 488 U.S. at 58, 102 L. Ed. 2d at 289, 109 S. Ct. at 337. The rationale of the Youngblood court is explained in the opinion, where the court held "[w]e think that requiring a

defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." Youngblood, 488 U.S. at 58, 102 L. Ed. 2d at 289, 109 S. Ct. at 337.

Illinois courts have adopted the Youngblood "bad faith" test. See People v. Hoover, 250 Ill. App. 3d 338, 347 (1993), citing People v. Tsombanidis, 235 Ill. App. 3d 823 (1992); People v. Hall, 235 Ill. App. 3d 418 (1992); People v. Young, 220 Ill. App. 3d 488 (1991); People v. Stallings, 211 Ill. App. 3d 1032 (1991); People v. Lampkin, 193 Ill. App. 3d 570 (1990). Despite Karim's suggestion that People v. Danielly, 274 Ill. App. 3d 358, 363 n.1 (1995), heralds a trend toward a more liberal approach than the "bad faith" test, our courts continue to support the Youngblood approach. Also see People v. Toft, 355 Ill. App. 3d 1102, 1106 (2005); People v. Camp, 352 Ill. App. 3d 257, 260-61(2004). Camp differs from Toft in one important respect. Camp holds that, if a defendant puts the State on notice with a discovery request that it wants a particular piece of evidence, the trial court may impose a discovery sanction for a failure to comply with discovery request, even absent a showing of bad faith. Camp, 352 Ill. App. 3d at 261 (the evidence must be essential or outcome determinative).

In order to consider this argument, we must review the chronology of events in this case. The police arrived on the scene shortly after the shooting. The police found Black lying in the street after having been shot 11 times. The police also found two dead men in the car. The police did not find Karim because he was in the process of leaving the jurisdiction. The police examined the car

and found the baseball bat partially tucked under the car seat. The police photographed the inside of the car, including the bat. That photograph was made part of the evidence, thereby establishing that the bat existed. The police, having no further need for the car and its contents, and being unaware of Karim's plans to raise a defense of self-defense, returned the car and its contents to Harris's family. Based upon the testimony of a forensic investigator that the bat had no evidentiary value, and the fact that the bat was returned to its owner before Karim's discovery motion was filed, we find that Karim has failed to establish bad faith. Instead, he is attempting to impute bad faith to the police based upon his theory of what the bat might show. However, according to Toft, Trombetta only requires the preservation of evidence with apparent exculpatory value. Toft, 355 Ill. App. 3d at 1106, citing Trombetta, 467 U.S. 479, 81 L. Ed. 2d 413, 104 S. Ct. 2528.

Additionally, once Karim returned to the jurisdiction and was arrested, both the custodial statement he gave and his testimony at trial contradicted his theory of innocence based upon self-defense. Karim's custodial statement admitted guilt. Additionally, Karim testified that he panicked and began shooting when Harris attempted to start the car. Karim was asked about the bat, which he acknowledged seeing. Karim testified that he called for his friend Scott, who had the gun. Karim testified that he took the gun and began shooting. On cross-examination, Karim was asked about the bat. Karim testified that he saw Parker fumbling for the bat when he was shot. As a result, Karim's own testimony fails to support not only his claim of self-defense but his claim that the bat was an important piece of evidence. We also note that the underlying motion for discovery was filed nine months after the murder and two months after Karim's arrest. The motion to dismiss the case was filed two weeks after the motion for discovery. Here, Karim failed to demonstrate the State's bad

faith in failing to preserve the baseball bat; therefore, we find no error in the trial court's refusal to sanction the state by dismissing the case.

### Impartial Jury

Next, Karim argues that he was deprived of his right to a fair and impartial jury. Karim argues the trial court failed to abide by People v. Zehr, 103 Ill. 2d 472 (1984), and Supreme Court Rule 431(b) (177 Ill. 2d R. 431(b)). Karim argues that the trial court erred in refusing to allow him to *voir dire* potential jurors to ascertain their attitudes toward self-defense. Karim sought to question the jurors about whether they could maintain the presumption of innocence where a defendant admitted the murders but claimed he did so in self-defense. Karim notified the State that he intended to assert a claim of self-defense. In response, the State filed a motion *in limine* asking the judge to limit *voir dire* to the questions mandated by Supreme Court Rule 431(a) (177 Ill. 2d R. 431(a)). The trial court granted the State's motion, holding "I'm not going to allow you to ask them questions that tend to inculcate them with the theory of the case. If that is what you want to do, you can't do it." Karim argues he should receive a new trial.

The State argues that the trial court committed no error. The State argues that a question about a juror's attitude to self-defense is not a Zehr question. The State argues that supreme court rules prohibit questioning jurors regarding self-defense. The State argues that questions regarding predispositions toward self-defense would only serve to improperly preeducate and indoctrinate the jurors as to the defendant's theory of the case.

The Illinois Constitution provides that a criminal defendant is guaranteed the right to trial by jury. Ill. Const. 1970, art. I, §13. In accordance with the dictates of the constitution, trial courts

have the primary responsibility for conducting *voir dire*. People v. Strain, 194 Ill. 2d 467, 476 (2000), citing People v. Terrell, 185 Ill. 2d 467, 484 (1998), People v. Williams, 164 Ill. 2d 1, 16 (1994), and People v. Lobb, 17 Ill. 2d 287, 300 (1959) (interpreting the 1870 constitution). "'[T]he purpose of *voir dire* is to ascertain sufficient information about prospective jurors' beliefs and opinions so as to allow removal of those members of the venire whose minds are so closed by bias and prejudice that they cannot apply the law as instructed in accordance with their oath.' " Strain, 194 Ill. 2d at 476, quoting People v. Cloutier, 156 Ill. 2d 483, 495-96 (1993).

In Zehr, our supreme court interpreted Supreme Court Rule 234. Zehr, 103 Ill. 2d at 476-78; 87 Ill. 2d R. 234. The current version of Supreme Court Rule 234 provides that "[t]he court shall conduct the *voir dire* examination of prospective jurors by putting to them questions it thinks appropriate touching upon their qualifications to serve as jurors in the case on trial. The court may permit the parties to submit additional questions to it for further inquiry if it thinks they are appropriate, and shall permit the parties to supplement the examination by such direct inquiry as the court deems proper for a reasonable period of time depending upon the length of examination by the court, the complexity of the case, and the nature and extent of the damages. Questions shall not directly or indirectly concern matters of law or instructions. The court shall acquaint prospective jurors with the general duties and responsibilities of jurors." 177 Ill. 2d R. 234.

Zehr holds that "essential to the qualification of jurors in a criminal case is that they know that a defendant is presumed innocent, that he is not required to offer any evidence in his own behalf, that he must be proved guilty beyond a reasonable doubt, and that his failure to testify in his own behalf cannot be held against him. If a juror has a prejudice against any of these basic

guarantees, an instruction given at the end of the trial will have little curative effect. It is also vital to the selection of a fair and impartial jury that a juror who finds that the State has failed to sustain its burden of proof of guilt beyond a reasonable doubt have no prejudices against returning a verdict of not guilty." Zehr, 103 Ill. 2d at 477.

Supreme Court Rule 431 provides that "(a) * * * Questions shall not directly or indirectly concern matters of law or instructions. The court shall acquaint prospective jurors with the general duties and responsibilities of jurors"; and (b) "If requested by the defendant, the court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects." 177 Ill. 2d R. 431.

Our courts have consistently refused to allow *voir dire* questions concerning a defendant's theory of self-defense. People v. Dunum, 182 Ill. App. 3d 92, 101 (1989); People v. Skipper, 177 Ill. App. 3d 684, 687 (1988); People v. Kindelan, 150 Ill. App. 3d 818, 822 (1986); People v. Muhammad, 132 Ill. App. 3d 901, 905 (1985); People v. Kendricks, 121 Ill. App. 3d 442, 448-49 (1984); People v. DeSavieu, 120 Ill. App. 3d 420, 426 (1983); People v. Bradley, 97 Ill. App. 3d 1100, 1102 (1981). The rationale behind these cases is that "allowing [a] defendant to question the prospective jurors regarding any pre-disposition to a self-defense claim goes to an ultimate question

of fact and would serve no purpose other than to improperly attempt to preeducate and indoctrinate the jurors as to defendant's theory of the case." Skipper, 177 Ill. App. 3d at 688, citing People v. Phillips, 99 Ill. App. 3d 362, 369 (1981). As the State correctly points out, exceptions to this general rule for cases involving controversy, bias and prejudice have been held to include insanity (People v. Stack, 112 Ill. 2d 301, 311 (1986)), street gangs (People v. Strain, 194 Ill. 2d 467, 475-77 (2000)), alcohol and drugs (People v. Lanter, 230 Ill. App. 3d 72, 75-76 (1992)), and drug dealers (People v. Morales, 329 Ill. App. 3d 97, 112-14 (2002), rev'd, 209 Ill. 2d 340 (2004)). Despite Karim's argument that the self-defense line of questioning went to the core of the presumption of innocence, in light of this overwhelming authority, we cannot find error in the trial court's refusal to allow *voir dire* questions regarding potential jurors' attitudes to self-defense.

Prosecutorial Misconduct

Finally, Karim argues that the State committed prosecutorial misconduct. Karim argues the State made improper remarks during closing arguments that: (1) misstated the evidence; and (2) were supported by neither the facts nor reasonable inferences. According to Karim, the State improperly argued: (1) that Karim did not run away after getting out of the car; (2) that Karim did not run from the car after the shooting; (3) that the State knew whose blood was on the baseball bat; and (4) that a debt was owed to the people of Cook County and the State of Illinois, such that a verdict of second degree murder would constitute a victory for the defense. Karim argues the cumulative effect of the prosecutorial misconduct prevented him from receiving a fair trial.

The State initially argues that Karim waived this issue by failing to directly quote from the record or providing record citations. The State also argues that Karim failed to object to some of the

alleged improper comments. According to the State, the prosecution did nothing wrong because the arguments were proper and wholly based on the evidence with no misrepresentations or misstatements. The State also argues that the trial court correctly gave the prosecution great latitude in making its closing argument.

Supreme Court Rule 341(e)(7) provides that "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citations of the authorities <u>and the pages of the record relied on</u>. Evidence shall not be copied at length, but reference shall be made to pages of the record on appeal or abstract, if any, where evidence may be found." (Emphasis added.) Official Reports Advance Sheet No. 21 (October 17, 2001), R. 341(e)(7), eff. October 1, 2001. The reason behind Supreme Court Rule 341(e)(7) is well established. " 'A reviewing court is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented [citation], and it is not a repository into which an appellant may foist the burden of argument and research [citation]; it is neither the function nor the obligation of this court to act as an advocate or search the record for error [citation]." <u>XLP Corp. v. County of Lake</u>, 359 Ill. App. 3d 239, 256 (2005), quoting <u>Obert v. Saville</u>, 253 Ill. App. 3d 677, 682 (1993).

Karim failed to make appropriate citations to the record in his brief. The State responded to the general statements in Karim's arguments by attempting to discern from the record those portions of the closing argument Karim might have found objectionable. In his reply brief, Karim apologizes to this court for his error and accepts the State's citations as accurate. Therefore, despite Karim's failure to comply with the provisions of the supreme court rules, we will address the portions of the closing argument Karim found objectionable.

We recently addressed the subject of prosecutorial misconduct by improper arguments in People v. Deloney, 359 Ill. App. 3d 458 (2005). Deloney holds that "[t]he character and scope of an attorney's opening and closing arguments are generally left to the circuit court's discretion, and prosecutors are afforded wide latitude in their closing arguments." Deloney, 359 Ill. App. 3d at 470, citing People v. Ellis, 315 Ill. App. 3d 1108, 1121 (2000), and People v. Kirchner, 194 Ill. 2d 502, 549 (2000). Deloney also holds that "[d]uring argument, a prosecutor may comment upon the evidence presented and enunciate reasonable inferences arising therefrom, even if those inferences are unfavorable to the defendant." Deloney, 359 Ill. App. 3d at 470, citing People v. Williams, 147 Ill. 2d 173, 232 (1991). To warrant reversal on appeal, a defendant must demonstrate that without the prosecutor's remarks there remains doubt as to whether the jury would have rendered a guilty verdict. Deloney, 359 Ill. App. 3d at 470, citing People v. Nieves, 193 Ill. 2d 513, 533 (2000). Reviewing courts should not hesitate to reverse an otherwise proper conviction where prosecutorial remarks and improper arguments violate the defendant's right to a fair trial. Deloney, 359 Ill. App. 3d at 470, citing People v. Johnson, 208 Ill. 2d 53, 84-85 (2003), and People v. Blue, 189 Ill. 2d 99, 132-34 (2000). Although the prosecutor should be zealous in its arguments, it should not cause the jury to depart from rational deliberation of the facts, thereby undermining the trustworthiness and integrity of the judicial process. Deloney, 359 Ill. App. 3d at 470, citing Johnson, 208 Ill. 2d at 84-85.

Karim argues that the prosecutor misstated the evidence by arguing that he did not run from the car after the shooting. The State believes that Karim might be arguing that Karim is objecting to the prosecutor's comment that "[you can infer Karim's intent] from the fact that he did not run away

from the car." The State correctly points out that no contemporaneous objection was raised when that statement was made. "To preserve an issue for review, a defendant must raise an objection both at trial and in a written postural motion." People v. Bush, 214 Ill. 2d 318, 332 (2005), citing People v. Enoch, 122 Ill. 2d 176, 186 (1988). Therefore, where Karim failed to object to the prosecutor's comments, any claim of error resulting from those comments is waived. Bush, 214 Ill. 2d at 332.

The prosecutor returned to the subject of Karim not running from the car later in the closing argument by commenting "[b]ut I'm telling you now, it makes not a bit of difference whether he was in the car or whether he was out of the car. Because we know at some point he got out of the car and he didn't go running anywhere." Karim raised an objection to this statement. However, Karim did not satisfactorily explain the basis of the objection either in the record or the brief. Instead, Karim objected "for the reasons previously stated." As the State tried and failed, we can find no reference to the allegedly previously-stated basis for that objection. This is precisely the reason the supreme court promulgated Supreme Court Rule 341(e)(7). Official Reports Advance Sheet No. 21 (October 17, 2001), R. 341(e)(7), eff. October 1, 2001. The record in this case exceeds 2,800 pages in length. The rules do not require this court to scour the record in search of the alleged prosecutorial misconduct, to construct or interpret Karim's arguments, and to ferret out the basis for his objections. XLP Corp., 359 Ill. App. 3d at 256; Official Reports Advance Sheet No. 21 (October 17, 2001), R. 341(e)(7), eff. October 1, 2001.

The State identified one more passage in the record where it argued that Karim did not run away. The State believes Karim might have been arguing that this passage constitutes error by prosecutorial misconduct. In commenting on the alleged failure to run away, the prosecutor

characterized Karim as being panicked and afraid. This drew an objection, again without a specified basis. The trial court overruled the objection. The prosecutor continued, commenting that Karim did not run away, but instead went to the opposite side of the car and shot Black. The prosecutor characterized Karim's actions as a hunt, not the actions of a frightened man. The prosecutor then argued that, taken in context of shooting all three men, the self-defense claim is unbelievable. The prosecutor then proceeded to describe the chain of events leading to the shooting of all three men before concluding that "the guy who says he was acting in self-defense runs to the car he has set up, the getaway car, a block away." The State argues these comments, taken in their proper context, demonstrate that Karim intended to kill all three men. We find that these are permissible inferences based on the evidence in the record.

The last item the State identified in the record that it believes Karim might have found objectionable deals with the baseball bat. The prosecutor commented that the police were never trying to hide the existence of the baseball bat, as it was photographed as having been in the car at the time of the shooting. The prosecutor then commented that the existence of blood on the baseball bat and the unknown identity of the person whose blood was on it was irrelevant. Karim objected to the prosecutor's comment "we know whose blood is on the bat." Karim did not renew his objection later when the prosecutor commented that the blood must have belonged to Parker or Harris or both. According to the State, this statement was based on or was an inference from the testimony of Investigator Karalow, who testified that the blood dripped on the baseball bat. This, coupled with the prosecutor's comment that Karim had no injuries consistent with having been hit with a baseball bat, supports the State's theory and casts doubt upon Karim's self-defense theory. We find the

1-03-1147

State's inferences reasonable given the facts in this case.

Any of Karim's remaining objections to the prosecutor's closing argument lack supporting citations to authority or passages in the record and are, therefore, waived pursuant to Supreme Court Rule 341(e)(7). Official Reports Advance Sheet No. 21 (October 17, 2001), R. 341(e)(7), eff. October 1, 2001. Accordingly, in light of the preceding, we do not find that the prosecutor's closing argument was improper or that Karim was denied a fair trial.

CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

O'BRIEN, J., and O'MARA FROSSARD, J., concur.