THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KRISTOPHER DELONEY, Defendant-Appellant.

First District (4th Division)   No. 1—03—0767

Opinion filed August 11, 2005.—Rehearing denied September 16, 2005.

Michael J. Pelletier and Justin J. Major, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Peter Fischer, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GREIMAN delivered the opinion of the court:

Following a jury trial defendant Kristopher Deloney was convicted of first degree murder and sentenced to 40 years in prison. On appeal, he contends that he received ineffective assistance of trial counsel and that he was denied a fair trial when the prosecutor made prejudicial statements to the jury. For the reasons that follow, we affirm.

Defendant was initially charged with first degree murder, armed robbery, home invasion, and residential burglary. Prior to trial, defendant filed a motion to suppress statements he had made to police

officers and an assistant State's Attorney while in custody. He argued that he had not been advised of his *Miranda* rights at the time of his arrest and that he was denied access to an attorney as well as communication with his family members and that his statements were therefore not given knowingly and intelligently.

At the hearing on the motion, Chicago police officer Ronald Gibbs testified that, in February 2000, he was investigating a theft reported by Lonnie Rupert, who had alleged that someone had made purchases on his credit card without permission. On February 20, Gibbs' investigation led him to suspect defendant, whom he transported to the police station and advised of his *Miranda* rights prior to questioning him about the theft. Defendant indicated that he understood his rights and agreed to speak with Gibbs and fellow officer Brian Nelson. Defendant was released on bond later that evening.

On February 25, 2000, Officer Gibbs learned that Rupert had been murdered and sought defendant for questioning. He encountered defendant on February 27 and took him into custody. Defendant asked Gibbs why he was being arrested, and Gibbs instructed him not to speak and read him his *Miranda* rights. Gibbs transported defendant to the police station and placed him in an interrogation room. Gibbs read defendant his *Miranda* rights again and proceeded to question him about a credit card bearing Rupert's name that was found in his possession. Defendant never asked to make a telephone call or otherwise communicate with his family and appeared coherent and understanding of his legal rights.

Detective William Halloran testified that early in the morning of February 28, 2000, he and Detective Patrick Durkin went to the interview room where defendant was being held. Defendant was sleeping when they arrived, so the detectives awoke him. They introduced themselves to defendant, explained that they were investigating a homicide, and advised him of his rights. Defendant indicated that he understood his rights and agreed to answer the detectives' questions. Defendant never asked to be allowed to contact an attorney or his family, nor did he show any signs of incoherence due to food or sleep deprivation. The detectives interviewed defendant on several subsequent occasions, and at no time was defendant deprived of food or sleep.

Detective Halloran stated that on March 1, 2000, Assistant State's Attorney Tom Darman advised defendant of his rights and proceeded to interview him about Rupert's murder. Defendant indicated that he understood his rights and never indicated that he had been deprived of food or sleep, nor did he express any desire to contact anyone.

On cross-examination, Detective Halloran stated that defendant

was advised of his rights from a police handbook, but that defendant was never given a printed page of his *Miranda* rights. Halloran was unaware of what time defendant had been allowed to eat or sleep prior to being interviewed on the morning of February 28. Halloran reiterated that defendant never requested to contact his family or speak with a lawyer during the several days that he was in custody. No written reports indicated whether or when defendant had been given anything to eat, nor were any of defendant's statements recorded on audiotape or videotape. Halloran never spoke with any of defendant's family members, and none came to the station to see defendant while he was in custody.

Detective Durkin testified in a manner similar to that of Detective Halloran. He stated that he read defendant his *Miranda* rights prior to questioning him, but did not document that fact. Durkin was not aware of whether defendant had slept or eaten prior to the times he and Halloran interviewed him on February 28, 2000. While defendant was in custody, Durkin would occasionally check on him and ask whether he needed anything. He did not recall whether any of defendant's family members came to the police station while he was in custody and he did not ask defendant to give any statements on videotape or audiotape. Defendant never asked to make a phone call or otherwise contact his family or an attorney. Durkin authored a general progress report regarding the investigation, in which he recorded statements defendant had made regarding the homicide. The report noted that defendant had been given food and water and was allowed to use the restroom. Durkin never threatened defendant with violence in case he did not cooperate nor did he hear anyone else issue any threats.

Detective Durkin further testified that he had conversations with defendant and based on those conversations he took measures to have evidence analyzed and spoke with other witnesses. He stated that having certain evidence analyzed—such as footprints and fingerprints—took the majority of the time defendant was in custody prior to booking from February 27, 2000, until March 1, 2000, despite his efforts to expedite the analysis. On March 1, he contacted Assistant State's Attorney Tom Darman, who proceeded to the police station and undertook investigations and interviews of his own.

Defendant's sister-in-law, Marcietta Deloney, testified that she learned of defendant's arrest on February 28, 2000, and went to the police station and asked to speak with him. After a long wait, a detective, whom Deloney later identified as Detective Durkin, arrived and spoke with Deloney and assured her that defendant had been treated well. When Deloney asked again to speak with defendant, the detec-

tive refused, stating that defendant was sleeping. On cross, Deloney stated that she did not go to the police station when she had learned of his prior arrest on February 20, 2000.

Defendant's mother, Ardelia Deloney, testified that she learned of defendant's February 27, 2000, arrest that evening and later received a phone call from him on March 1, 2000. She stated that defendant began to cry and told her that detectives would not speak with her and that they had advised him not speak with her anymore until he had met with a lawyer. Defendant called again later and informed Deloney that he was being charged with murder.

Defendant testified that on the afternoon of February 28, 2000, a police officer chased him and placed him in custody without advising him of his *Miranda* rights. He was transported to the police station and placed in a holding cell, where Officer Gibbs strip-searched him and asked him about items he found in defendant's pockets, again without advising defendant of his rights. Defendant remained there for approximately $2\frac{1}{2}$ hours and was then transported to another station and placed in another holding cell. There Gibbs asked him about Rupert's murder. Defendant asked several times if he could be allowed to call his family or an attorney, but Gibbs never responded. Defendant remained in the cell for several hours, and other detectives entered and asked him about the murder, without advising defendant of his *Miranda* rights. Defendant asked if he could make a phone call or contact an attorney. The detectives told him he would not need an attorney if he were innocent and would not allow him to call his family.

Defendant was repeatedly questioned about the murder through the course of the night and was not allowed to sleep. At approximately 9 a.m. the next morning, Gibbs asked defendant whether he would like anything to eat. Defendant responded that he did but was never given anything. Detectives confiscated defendant's shoes for examination, and defendant was not given any other shoes to wear for two days. He was not given anything to eat for over 24 hours after his arrest, and his previous requests for food had been ignored. Detectives repeatedly questioned defendant about Rupert's murder throughout the time he was in custody. Every time defendant fell asleep, an officer would enter the cell and wake him.

During his third day in custody, an assistant State's Attorney suggested that defendant take a polygraph test. Defendant was transported to another police station and administered the test. He signed a form waiving his right to an attorney and answered the questions asked of him. He was later transported back to the other police station and placed in the same cell. The assistant State's Attorney suggested that defendant give a statement on videotape in exchange for being al-

lowed to make a phone call. Defendant agreed and was later taken to another room where he called his mother. Afterward, defendant refused to give a videotaped statement, and the assistant State's Attorney became upset. Thereafter defendant was booked for the murder of Rupert.

On cross-examination, defendant identified a form he had signed prior to taking the polygraph examination, which stated that he understood his right to remain silent and that anything he said could be used against him. Defendant was aware, in general, of his right to remain silent, his right to an attorney, and his right to make a phone call while in custody, and that any statements he gave could be used against him. He stated that, while he was in custody prior to booking, officers verbally threatened him in attempts to get him to cooperate with the investigation.

Assistant State's Attorney Darman testified that he was assigned to investigate Rupert's murder and that on March 1, 2000, he spoke with defendant about the crime. Darman introduced himself and advised defendant of his rights. Defendant indicated that he understood his rights and agreed to talk to Darman. Defendant never asked to speak with an attorney or with his family members. Darman never offered to allow defendant a phone call if he agreed to make a videotaped statement, and defendant never complained about a lack of sleep or food or any mistreatment by the police.

The trial court denied defendant's motion to suppress, finding that, while the amount of time defendant was held before being charged was unusually long, the testimony of the State's witnesses was more credible than that of defendant and the witnesses he called. The court acknowledged that defendant was in custody for an unusually long period of time, but concluded that it was attributable to the detectives investigating details and discrepancies in response to statements given by defendant, and was not orchestrated in an effort to deprive defendant of his constitutional rights.

During opening statements, the prosecutor stated that the victim, Rupert, had been "murdered by a thief, a drug addict, an armed robber, and a killer." Referring to defendant, he addressed the jury, "Meet the thief, meet the crack-head, meet the robber, meet the murderer ***." He went on to explain that Rupert had allowed defendant to stay in the basement apartment of the building he owned and in which he also resided, and that defendant had acquired Rupert's credit card number, used the number to order expensive merchandise, intercepted the deliveries, then pawned the merchandise for cash, which he used to buy drugs from a dealer named Damien Bey. When the theft was discovered, Rupert had defendant arrested and changed the locks on

the apartment. In response, defendant killed Rupert and took his mobile phone and credit card and traded the phone to Bey in exchange for crack cocaine. The prosecutor again referred to defendant as a "crack-head" in urging the jury to find him guilty.

Rupert's friends and neighbors testified that Rupert had allowed defendant to reside in the basement apartment of the building he owned located at 7320 South Yates. On February 20, 2000, Rupert ordered defendant out of the apartment under the belief that defendant had stolen his credit card and had used it to make several purchases from the QVC television network and the Shop at Home catalog. Witnesses identified defendant as the individual who took delivery of some of the items and as the individual who sold some of them to area pawnshops. Bey testified that he had given defendant some crack cocaine in exchange for a new leather coat, which was later found to have been purchased with Rupert's credit card. Other witnesses testified that they had observed defendant purchase crack cocaine in the vicinity of Rupert's building. Defendant was arrested and charged with theft as a result of the purchases, and officers recovered some of the merchandise as well as mail addressed to the building's other tenants from the apartment defendant had occupied. One witness testified that she saw Rupert change the locks on the basement apartment on February 24, 2000.

On the afternoon of February 25, 2000, Rupert spoke with the other residents of his building and asked whether the electricity in their apartments was working. He informed them that the electricity in his own unit was out and that he would have to access the basement in order to restore it. Rupert missed an appointment later that day, and a friend called his mobile phone to check on him. An individual other than defendant answered but did not identify himself. Bey testified that defendant had given him the phone in exchange for crack on or about February 25, 2000, that he used the phone several times, and that he turned it in to police when he learned that it had belonged to the victim of a homicide.

The other tenants called the police, who searched the basement and found Rupert dead, his body concealed beneath a pile of clothes. He had been beaten and stabbed to death. Officers found a broken knife and bloody footprints near the body. They also recovered an empty wallet belonging to Rupert as well as his empty mobile phone belt clip.

Detectives Durkin and Halloran processed the scene and found defendant's bail bond slip from his February 20 arrest. They issued a stop order for defendant. Officer Gibbs took defendant into custody on the evening of February 27, 2000, and recovered Rupert's credit card

and a set of keys that matched the new locks Rupert had installed on the basement door on February 24. Even though defendant had been advised of his right to remain silent, he explained that he had found the credit card and planned to return it to Rupert and that the keys had been in his possession for several months. Durkin and Halloran interviewed defendant later that night and examined the boots he was wearing, as the tread on the bottoms resembled the patterns on the footprints found at the murder scene. (The State's expert witnesses testified that the treads from defendant's boots and the footprints found at the scene closely resembled each other and that a trace of human blood was recovered from one of defendant's boots.)

The detectives interviewed defendant again 90 minutes later and observed that he had several cuts on his hands. Defendant explained that he had hurt himself pushing a car out of heavy snow. On February 28, the detectives called Rupert's cell phone number and spoke with Bey, who explained that he had gotten the phone from defendant in exchange for crack. The detectives again spoke with defendant, who told them he attempted to "clear the air" with Rupert after his February 20 arrest but was unable to meet with him. He explained that he left Rupert's building that night and slept in various other locations throughout the next few days. He could not explain how he came to be in possession of Rupert's phone or keys. The detectives interviewed defendant again on February 29 and March 1, 2000. During the latter interview, defendant retracted his earlier statements and told detectives he had returned to the basement apartment on February 25 and that an unidentified man accosted him. Defendant alleged that he found a knife on the floor and defended himself. He also found the cell phone and his boots and left the apartment. He came back that night and slept there, and in the morning found a coat, in the pocket of which he found the keys in his possession at the time of his arrest. He slept there the next night and found the credit card the following morning. He never realized there was blood on the floor and must have stepped in it inadvertently.

Assistant State's Attorney Darman interviewed defendant on March 1, 2000, and advised him of his *Miranda* rights. Defendant told Darman the same things he had told the detectives.

During closing arguments, the assistant State's Attorney remarked that the State's circumstantial evidence was sufficient to find defendant guilty beyond a reasonable doubt and repeatedly referred to defendant as a "crack-head" when remarking on his statements to the police. The prosecutor also approached the defense table and addressed defendant directly. Defense counsel objected and moved for a mistrial. The trial judge acknowledged that the prosecutor's behavior was out of line but denied the motion.

The jury found defendant guilty of first degree murder and not guilty of armed robbery. At the sentencing hearing, defense counsel moved for judgment notwithstanding the verdict, or in the alternative a new trial, arguing, *inter alia*, that the trial court erred in denying defendant's motion to suppress his statements to the police and that the prosecutor's remarks during opening and closing arguments had so inflamed the jury as to deny defendant a fair trial. The trial court denied the motion and sentenced defendant to 40 years in prison.

Defendant initially contends that he was denied effective assistance of trial counsel when his attorney failed to challenge the admission of his statements to police on the basis of his lengthy detention and instead argued that his statements were obtained unlawfully because defendant was not allowed to contact his family or an attorney during his time in custody. He argues that the length of his detention and the fact that he was not brought before a judge for a probable cause hearing within 48 hours of his arrest render his statements unreliable and therefore inadmissible, that a suppression motion made on that basis would have succeeded, and that the absence of his statements from the trial evidence would have altered the trial's outcome. The State counters that defendant's detention without a probable cause hearing was not unlawful and that a motion to suppress on that basis would not have been successful. We agree.

In order for a defendant to demonstrate ineffective assistance of counsel, he must show that counsel's performance was objectively deficient and that the deficient performance led to substantial prejudice against defendant. *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). Where a reviewing court may dispose of an ineffective assistance claim on the ground of lack of prejudice, it should do so, and it is not required to examine the individual quality of counsel's performance. *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069. In assessing whether defendant suffered substantial prejudice, a reviewing court considers whether the result of the relevant proceeding would have been different but for counsel's performance. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

■ When arguing ineffective assistance of counsel, a defendant must overcome the presumption that the attorney's conduct will be considered a matter of trial strategy. *People v. Giles*, 209 Ill. App. 3d 265, 271 (1991). The decision to file a motion to suppress and the grounds upon which to argue for suppression are generally considered matters of trial strategy, and in order to show that such a decision amounted to ineffective assistance, a defendant must demonstrate that the trial outcome would have differed had such a motion suc-

ceeded. *People v. Rodriguez*, 312 Ill. App. 3d 920, 925 (2000). Neither mistakes in trial strategy nor the benefit of another attorney's hindsight are sufficient to demonstrate that the trial lawyer was objectively incompetent. *People v. Young*, 341 Ill. App. 3d 379, 383 (2003).

■ Under the fourth amendment, a defendant arrested without a warrant is entitled to a probable cause hearing in order to justify any prolonged detention. *People v. Groves*, 294 Ill. App. 3d 570, 577 (1998). The Supreme Court has held that a probable cause hearing within 48 hours of a defendant's warrantless arrest generally passes constitutional muster. *County of Riverside v. McLaughlin*, 500 U.S. 44, 56, 114 L. Ed. 2d 49, 63, 111 S. Ct. 1661, 1670 (1991). Where no such hearing is held within a 48-hour period, the State must show some exigence or emergency circumstances justifying the delay. *McLaughlin*, 500 U.S. at 57, 114 L. Ed. 2d at 63, 111 S. Ct. at 1670. However, the Supreme Court has not prescribed a specific remedy for the State's failure to make such a showing where a *McLaughlin* violation is apparent. *Powell v. Nevada*, 511 U.S. 79, 84-85, 128 L. Ed. 2d 1, 7-8, 114 S. Ct. 1280, 1283-84 (1994).

Defendant contends that because he was detained for more than 48 hours without a probable cause hearing, and because no extraordinary circumstances existed that prevented the State from presenting defendant for such a proceeding (resulting in a *McLaughlin* violation), a motion to suppress the statements he made to the detectives and assistant State's Attorney would have succeeded and the statements would have been excluded, in accordance with this court's recent decisions in *People v. Willis*, 344 Ill. App. 3d 868 (2003), *rev'd*, 215 Ill. 2d 517 (2005), and *People v. Mitchell*, 354 Ill. App. 3d 396 (2004). The court in those cases held that statements to police by a defendant held for more than 48 hours before issuing those statements were inadmissible as they likely stemmed from defendant's prolonged confinement and were therefore involuntary.

However, the Illinois Supreme Court recently overruled those decisions, holding that the admissibility of the defendant's statement hinged on whether it was voluntary, and adopted the view that prolonged detention is only one factor in determining whether an inculpatory statement was given voluntarily and should be admitted or suppressed; it is not dispositive. *People v. Willis*, 215 Ill. 2d 517 (2005). The court stated that its inquiry was whether the benefit of excluding a putatively voluntary statement in order to deter police from violating *McLaughlin* would outweigh the social costs of such a rule. *Willis*, 215 Ill. 2d at 531-32. The court concluded that the benefit of a strict exclusionary rule does not outweigh its social costs, reason-

ing that unduly detained defendants have civil remedies available to them under federal law (42 U.S.C. § 1983 (2000)), that police need some latitude in conducting their investigations with the limited resources available to them, and that triers of fact are not likely to ignore the duration of a detention preceding the issuance of a statement. *Willis*, 215 Ill. 2d at 532. The court resolved that, while undue delay may be considered, the decisive test of a statement's admissibility is whether or not it was given voluntarily, *i.e.*, "whether the inherently coercive atmosphere of the police station was the impetus for the confession or whether it was the product of free will." *Willis*, 215 Ill. 2d at 535, citing *People v. Morgan*, 197 Ill. 2d 404, 437 (2001).

■ In assessing whether a defendant's statement was voluntary, courts consider the totality of the circumstances, including defendant's age, intelligence, education, experience, and physical condition at the time of the detention and interview; the duration of the interview; whether *Miranda* warnings were issued; whether the defendant suffered any physical or mental abuse; and the legality and duration of the detention. *People v. Gilliam*, 172 Ill. 2d 484, 500-01 (1996).

Defendant's presentence investigation report indicated that, at the time of his arrest, he was 37 years old, that he had completed the eleventh grade, and that he had earned a chauffeur's license in 1987. He had been convicted of battery in 1991 and forgery in 1992 in a Georgia court and was sentenced to probation each time. An Illinois court found him guilty of criminal trespass to a vehicle in 1999 and he was sentenced to time already served. The report also indicated that he was in good physical and mental health, although he had smoked cocaine for approximately 12 years.

Defendant was interviewed three times in the approximately 80 hours before he gave the statement he sought to have suppressed. The officers with whom he spoke stated that they had issued him *Miranda* warnings and defendant signed a polygraph consent form indicating that he had received them. None of the interviews appear to have lasted longer than 30 minutes. The record indicates that defendant was given food and drink and was allowed to use the bathroom. Defendant complained that he was kept in a cold room without shoes and was not allowed to sleep, but the interviewing officers never indicated that he appeared cold or overly tired. His prior convictions indicate that he had at least some experience with the criminal justice system.

The police had probable cause to arrest defendant, in light of the facts that he had been arrested a few days prior for illegally using the victim's credit card and that the victim had been found in the location where defendant had most recently resided. Once the length of his

detention surpassed 48 hours, it violated *McLaughlin*. However, detectives testified that they confiscated defendant's boots for examination, investigated the whereabouts of the victim's cell phone, and awaited analysis of other evidence while defendant was detained. Durkin even testified that he would occasionally check on defendant and ask whether he needed anything. The record therefore indicates that the police were diligently engaged in the investigation and were not indifferent to defendant's presence or willfully disregarding *McLaughlin*. See *Willis*, 215 Ill. 2d at 538.

We also note that defendant's statements to police and the assistant State's Attorney were not inculpatory, but were exculpatory. We would think it highly unusual for a defendant to make an exculpatory statement under coercion, when the object of any police coercion would obviously be to obtain an inculpatory statement, even if it were not truthful. Defendant's statements could be construed indirectly as inculpatory, as their contradiction could lead to an inference of guilt or at least deceit on defendant's part. However, we will not go so far as to conclude that a defendant would give exonerating statements to police involuntarily.

While we do not excuse the unusual amount of time defendant was held without a hearing, we do not find that it, by itself, rendered defendant's statements involuntary and therefore inadmissible. See *Willis*, 215 Ill. 2d at 538. Moreover, the record indicates that the trial judge took note of defendant's unusually long detention in issuing his order to deny the motion to suppress, but he did not find that it rendered the statements involuntary. We therefore find that a motion to suppress them on such a basis would not likely have succeeded and would not have affected the trial's outcome. Accordingly, we conclude that defendant was not denied effective assistance of trial counsel.

■ Defendant next contends that he was denied a fair trial when the prosecutor referred to him as a "crack-head" several times during opening and closing arguments. He argues that the prosecutor engaged in repeated name-calling and did so in an attempt to inflame the passions and prejudices of the jury. The State responds that defendant has waived this issue for purposes of appeal and that, even if it has been properly preserved, the prosecutor's remarks were proper in that they referred to defendant's alleged motive for committing the crime and thus did not result in prejudice or an unfair trial.

Initially, we find that defendant has not waived this issue. The record reveals that defense counsel objected to the prosecutor's remarks at the time they were made and raised them as a basis in his motion for new trial, in accordance with *People v. Enoch*, 122 Ill. 2d 176, 186-92 (1988). Accordingly, we will consider the merits of defendant's argument.

The character and scope of an attorney's opening and closing arguments are generally left to the circuit court's discretion, and prosecutors are afforded wide latitude in their closing arguments. *People v. Ellis*, 315 Ill. App. 3d 1108, 1121 (2000); *People v. Kirchner*, 194 Ill. 2d 502, 549 (2000). During argument, a prosecutor may comment upon the evidence presented and enunciate reasonable inferences arising therefrom, even if those inferences are unfavorable to the defendant. *People v. Williams*, 147 Ill. 2d 173, 232 (1991). A prosecutor's remarks usually do not warrant reversal of a conviction unless they are so prejudicial to the defendant that, absent those remarks, there is doubt as to whether the jury would have rendered a guilty verdict. *People v. Nieves*, 193 Ill. 2d 513, 533 (2000).

The Illinois Supreme Court has expressed deep concern over the propensity of a prosecutor's remarks in argument to influence a jury's finding as to guilt or innocence and has stated that a reviewing court should not hesitate to reverse an otherwise proper conviction where the prosecutor makes improper arguments and thereby subverts the defendant's right to a fair trial. *People v. Johnson*, 208 Ill. 2d 53, 84-85 (2003); *People v. Blue*, 189 Ill. 2d 99, 132-34 (2000). The court was wary that trial courts might allow guilty verdicts to rest on considerations other than the evidence alone, namely, statements designed to encourage juries to return verdicts grounded in emotion, rather than rational deliberation of the facts, and which undermine the trustworthiness and integrity of the judicial process. *Johnson*, 208 Ill. 2d at 84-85.

Here, the prosecutor's repeated references to defendant as a "crack-head" could be construed as an attempt to inject evidence of defendant's character and propensity for illegal activity into the trial. Our supreme court has held that such evidence can overpersuade a jury, which might convict a defendant solely because it feels he or she is a bad person and deserving of punishment, and may warrant reversal. *People v. Lindgren*, 79 Ill. 2d 129, 137 (1980); *People v. Griffith*, 334 Ill. App. 3d 98, 117 (2002).

While we do not condone the prosecutor's use of such pejorative terms in describing defendant and his actions to the jury, we do not find that it rises to the level of reversible error. While the prosecutor could have labeled the nature of defendant's alleged addiction and other illegal activities more delicately, there was evidence in the record establishing that defendant had stolen from the victim in order to finance his habit, and it was reasonable to infer that his addiction and his prior dealings with Rupert served as a motive for Rupert's murder. Moreover, in light of the overwhelming amount of evidence indicative of defendant's guilt, we find it highly unlikely that the jury would

have reached a different result in the absence of the prosecutor's remarks. Accordingly, we find that the prosecutor's arguments do not constitute reversible error.

For the reasons set forth above, we affirm the judgment of the circuit court.

Affirmed.

THEIS and QUINN, JJ., concur.