FIFTH DIVISION
February 16, 2007

No. 1-04-3743

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 01 CR 23532(03) |
| | ) | |
| JUAN MACIAS, | ) | Honorable |
| | ) | James D. Egan, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE O'BRIEN delivered the opinion of the court:

Defendant, Juan Macias, appeals his conviction for first degree murder and his aggregate sentence of 42 years' imprisonment. On appeal, defendant contends that: (1) the trial court erred during voir dire by failing to sua sponte question the jurors to determine whether they were biased against street gangs; (2) the trial court erred by denying defendant's motion to suppress; (3) the prosecutor made improper remarks during closing arguments; (4) the trial court erred by adding 15 years to defendant's sentence pursuant to section 5-8-1(a)(1)(d)(i) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(d)(i) (West Supp. 2001)); and (5) the cause must be remanded for a new hearing pursuant to Batson v. Kentucky, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), because the trial court failed to make findings of fact following the prosecutor's race- neutral explanations for excusing two Hispanic jurors. We affirm.

The State charged defendant with two counts of first degree murder arising from the shooting death of Hector Chavez on September 12, 2001. Prior to trial, defendant filed a motion to suppress his statement to police. At the hearing on the motion, defendant testified that he was

arrested in connection with the shooting on September 14, 2001, and taken to the police station. He was 18 years old when arrested. The officers placed him in a small interrogation room which had neither a toilet nor a cot. Hours later, a detective came to talk with him. The detective did not read defendant his Miranda rights. Defendant asked to call his parents and to talk to an attorney, but the detective told him that he could not have an attorney and could not make any calls. Defendant later talked to Detective John Henry for about five minutes. Defendant told Detective Henry that he did not know anything about the shooting. Detective Henry then left defendant alone for several hours. Defendant slept fitfully on the floor.

Defendant testified that he later talked to another plainclothes police officer, whose name he did not remember. Defendant did not tell the officer anything. The police officer questioned him seven to eight times during his detention. Between interrogations, defendant stayed in the interview room and no one checked up on him. On the afternoon of September 15, another detainee gave him a Big Mac. The police let him use the restroom occasionally. Defendant was not fed at all on September 16. On September 17, the police gave him an Egg McMuffin, a bologna sandwich and a soda.

Defendant testified that an assistant State's Attorney interrogated him, and eventually he made a videotaped statement, in which he stated that he had been treated "all right." Detective Henry told him that if he made a statement, he would be given food and allowed to go home.

Detective Henry testified that defendant was arrested at 6 p.m. on September 14. Detective Henry talked to defendant in the interview room at 11:45 p.m. Defendant was not handcuffed, and he agreed to waive his Miranda rights before talking. They talked for about 15

minutes, and defendant did not incriminate himself in the shooting.  Detective Henry then left.

Detective Henry testified that at about 5 p.m. on September 15, he spoke with defendant again in the interview room.  Detective Henry gave defendant his Miranda warnings and confronted him with codefendants' statements, but defendant made no incriminatory statement.  Detective Henry spoke with defendant at 5 p.m. on September 16, but defendant again did not incriminate himself in the shooting.

Detective Henry testified that, while he was working on the case, defendant was allowed to sleep and use the restroom.  Detective Henry did not see anyone coerce defendant, deprive him of sleep, or tell him that he could go home if he made a statement.  Defendant never requested to call his parents or a lawyer.

Detective Girardi testified that he and Detective Ralston spoke with defendant at about 3 a.m. on September 17.  They read him his Miranda rights and told him what codefendants Christopher Kuhar and Sergio Jimenez had said about the shooting.  Defendant made an inculpatory statement.  The detectives left the room and called for an assistant State's Attorney from the felony review unit.

Assistant State's Attorney Megan Goldish testified that she spoke with defendant at 7:30 a.m. on September 17.  She asked defendant how he had been treated, and he told her that he had been treated fine and had been given food and allowed to use the bathroom.  ASA Goldish spoke with defendant for about 45 minutes, during which he made an inculpatory statement.  Defendant then agreed to make a videotaped statement.  The statement was recorded at 10:48 a.m.  The court viewed the opening portion of the videotape, in which defendant stated that he had been

treated "all right." The court then denied defendant's motion to suppress.

At trial, Saul Jimenez testified that Javier Garza, a member of the Latin Souls street gang, was shot to death on September 7, 2001. On September 12, Saul went to Garza's funeral, where he saw numerous Latin Souls, including defendant, Sergio Jimenez, and Christopher Kuhar. After the funeral, Saul went to Garza's mother's house. He drove with Kuhar, Sergio, and another Latin Soul named D.K.

Saul testified that he eventually left with Sergio, Kuhar, D.K., and a girl named Nicole. They took Kuhar's car and drove to an alley at 48th and Paulina. There were about 10 Latin Souls, including defendant, talking in the alley. Since Saul was not a member of the Latin Souls, he was excluded from the conversation, and so he stood about 30 feet away and talked to Nicole. He could not hear what the Latin Souls were talking about.

Saul testified that the group broke up, after which Sergio, Saul, D.K., and Kuhar all got into Kuhar's car. Defendant remained behind. Sergio had a gun in his waistband, but Saul did not know where he had gotten it from. Kuhar drove and Sergio sat in the front passenger seat. Saul sat behind Sergio and next to D.K. They drove to 48th and Bishop, territory which belonged to the LaRazas street gang. LaRaza was a rival gang of the Latin Souls. As they drove south on Bishop, Sergio told him to get his head down, and Saul heard eight or nine gunshots. Then they drove off and went back to the alley, where they scattered.

Maria Chavez testified that on September 12, 2001, she lived at 4738 South Bishop. Her 19-year-old son, Hector, lived with her. At about 6 p.m., Hector went outside. Maria was on the phone when she heard gunshots. She went outside and saw that Hector had been shot. Hector

was taken to the hospital, where he died. An autopsy revealed that the cause of death was multiple gunshot wounds.

Officer Thomas Finnegan testified that on September 12, 2001, he responded to a call regarding the shooting. At the scene, he received a description of the suspects and their car. About an hour later, he conducted a field interview of Kuhar, who appeared nervous and evasive. Some of the other investigating officers found Kuhar's car in a nearby alley and alerted Officer Finnegan, who arrested Kuhar and took him to the police station for questioning.

Officer Finnegan testified that on September 14, he talked with Detective Holmes, who informed him that detectives had interviewed Kuhar, Sergio, and Saul. Based on this conversation, Officer Finnegan went looking for defendant. Officer Finnegan went to 4922 S. Hermitage and talked to defendant's mother, who let him in the house.

Officer Finnegan testified that he spoke with defendant about a handgun. Defendant called over a Hispanic male and spoke to him in Spanish. The Hispanic male retrieved a bag containing a handgun. Officer Finnegan and defendant went to the police station, where Officer Finnegan determined that the gun was a .32-caliber automatic pistol. He informed defendant that the gun involved in the shooting was a 9 millimeter. They went to defendant's house, and defendant had the unidentified Hispanic male bring out another gun. Officer Finnegan and defendant returned to the police station, where defendant was placed under arrest.

Forensic investigators recovered several spent 9-millimeter cartridge cases and bullets from the scene of the shooting. Tests showed that the cartridge cases and bullets had been fired by the gun supplied by defendant.

ASA Megan Goldish testified substantially similar to her testimony at the hearing on the motion to suppress. She interviewed defendant at the police station on September 17, and he agreed to make a videotaped statement.

In his statement, defendant said that he was 19 years old and still lived with his parents. He recounted his membership in the Latin Souls, described their territory and that of their rival gangs, the Latin Saints and LaRazas. Defendant recounted the events of September 12, 2001, including his attendance at the Garza funeral. He said that he thought Garza had been shot by LaRazas. Defendant returned to his house to get the 9-millimeter handgun and put it under the hood of Kuhar's car. After the funeral, defendant and his friends went to Garza's mother's house, then to an alley by defendant's house. While they were in the alley, defendant told Sergio, D.K., and Kuhar to "light up" some LaRazas, meaning to shoot at them. He told them to go to 47th and Bishop, which was within LaRaza territory about six blocks away. Sergio had the gun in his waistband. They left and returned about 10 minutes later. Defendant asked where the gun was, and Sergio gave it to him. The gun was hot. Defendant wiped it off and put it inside his toilet tank.

Defendant testified in his own defense at trial. He stated that on September 11, 2001, he and some friends went to a funeral home for the visitation for his close friend, Javier Garza. Garza was a member of the Latin Souls and had been shot on September 7. While they were at the funeral home, some members of the Bishop street gang came into the funeral home and caused a disruption.

Defendant testified that Garza's funeral was on September 12. Defendant, Saul, Sergio,

Kuhar, Jose, and Joe Schultz drove to the funeral. Kuhar dropped off Sergio, Saul, and Jose at the cemetery, then defendant, Kuhar and Schultz went back to defendant's house to retrieve a gun. Defendant wanted the gun for protection because he thought that some of the Bishops might show up at the burial. They put the gun, a 9-millimeter pistol, under the hood of the car, then returned to the funeral.

Defendant testified that after the funeral, they went to Garza's mother's house. Defendant did not have the gun with him and did not know where it was. He did not talk to Kuhar or Sergio. They returned home at 7 p.m.

Defendant testified that he saw Kuhar and Sergio at about 7:30 p.m. behind the alley, seven or eight houses away from his house. They went to defendant's yard, where Sergio handed him the gun that he had earlier put under the hood of the car. The gun was warm and Sergio told him that he had shot at someone. Defendant told Sergio to leave. Defendant wiped the gun off and put it in the toilet tank in his bathroom. Defendant testified that he had not told Kuhar and Sergio to shoot at any rival gang members.

Defendant testified that police came to his house at about 8 p.m. the same day, told him he was a suspect in a shooting, and took him to the police station. After talking to police, defendant was put in a lineup and later released. On September 14, the police came back to his house and told him that he was a suspect in a shooting and that he had to give them a gun. He said that he did not know what they were talking about. The officer told him that he had to give them a gun or he could get 40 years in prison.

Defendant testified that he walked two houses away and had one of his friends bring out a

.32-caliber gun. The officer took defendant to the police station. They were there for 15 minutes when the officer told him that they were looking for a 9-millimeter handgun. They returned to defendant's house, where a friend retrieved the 9-millimeter gun from the same friend who had given him the first gun.

Defendant testified that the officer took him back to the police station and placed him in a windowless interview room. They did not read him his Miranda rights and they denied his requests to call his parents and use the bathroom. A day later he was questioned by Detective Henry, who did not give defendant his Miranda rights. He gave Detective Henry a statement, and Detective Henry left him alone for 20 hours. When the detective returned, defendant gave another statement. Detective Henry again refused to let defendant call his parents.

Defendant testified that on September 17, Detectives Girardi and Rolston questioned him. They did not read him his Miranda rights and they refused his request to call his parents. They told him that the only way he could use the bathroom or call his parents or go home is if he told them what they wanted to hear. They told him he could go home if he admitted that he told Sergio to "go light up" members of the LaRaza street gang. Defendant agreed to make a statement because he was frustrated and tired and he had only minimal sleep and food. Defendant testified that he did not actually tell Sergio or Kuhar to "go light up" any LaRazas on September 12.

In rebuttal, Detective Henry testified similarly to his testimony at the hearing on the motion to suppress. He stated that he read defendant his Miranda rights before interviewing him, and that defendant waived those rights. He also testified that defendant never asked him to use

-8-

the bathroom and never complained of being tired or frustrated.

Detective Girardi testified that he and Detective Rolston questioned defendant at 3 a.m. on September 17. Detective Girardi read defendant his Miranda warnings, which he waived. Defendant never asked to call a lawyer or his parents. Detective Girardi stated that he did not refuse to allow defendant to go to the bathroom, and he never told defendant to say that he had ordered Chavez's shooting.

Following all the evidence, the trial court instructed the jury that it had to decide whether, during the commission of the offense, defendant "or one for whose conduct he is legally responsible, was armed with a firearm." The jury answered the question in the affirmative and convicted defendant of first degree murder. The court sentenced defendant to 42 years' imprisonment, a 27-year base sentence and an additional 15 years based on the jury's special finding regarding the firearm. Defendant appeals.

First, defendant contends that the trial court erred during voir dire by failing to sua sponte question prospective jurors regarding their attitudes about gangs. The scope of voir dire rests within the trial court's discretion. People v. Gardner, 348 Ill. App. 3d 479, 488 (2004). An abuse of discretion will be found only if the conduct of the trial court thwarted the selection of an impartial jury. Gardner, 348 Ill. App. 3d at 488.

In the present case, the trial judge addressed the entire venire prior to individual questioning. He told them that, if selected, they must follow the law, that the defendant is presumed innocent, that the State has the burden of proof, and that the defendant is not required to prove his innocence and need not present any evidence. He told them that they must judge

every witness by the same standard, and that they could not find a witness more or less credible because of his occupation. He also informed them that sympathy, bias, and prejudice have no place in the trial. Following these general admonitions to the venire, he questioned them individually. Among other questions, the judge asked if they could be fair and impartial. The judge then allowed the parties to question the prospective jurors. The State asked if they had any reason that would prevent them from sitting in judgment of another human being. Defense counsel asked if anyone had a relative or close friend who is a member of any police department. Defense counsel did not ask, or request that the venire be asked, any questions regarding gang bias.

On appeal, defendant contends that he is entitled to a new trial because the trial court failed to sua sponte question the venire regarding their attitudes toward gangs. Defendant cites no cases supporting his argument and, as noted by the State, case law contradicts his position. See Gardner, 348 Ill. App. 3d at 487 (noting that no Illinois court has ever held that a trial court has a sua sponte duty to ask a gang bias question); People v. Pogue, 312 Ill. App. 3d 719 (1999); People v. Williams, 295 Ill. App. 3d 456 (1998) (holding that the trial court has no duty to make sua sponte inquiries regarding gang bias.)

Defendant contends that People v. Strain, 194 Ill. 2d 467 (2000), compels a different result. In Strain, the trial court said, before conducting voir dire, it would ask potential jurors questions relating to " '[t]he allegation they or any close member of their family or close friend had any involvement with a gang, could be membership, affiliation, could be a victimization and so the parties then would be fully aware of anything like that.' " Strain, 194 Ill. 2d at 470. After

-10-

the first panel of the venire was questioned, defense counsel asked the court to inquire of every potential juror whether "the juror would find defendant less believable if the juror learned that defendant belonged to a gang." Strain, 194 Ill. 2d at 471. The trial court denied the request and did not pose the question.

Our supreme court held that "when testimony regarding gang membership and gang-related activity is to be an integral part of the defendant's trial, the defendant must be afforded an opportunity to question the prospective jurors, either directly or through questions submitted to the trial court, concerning gang bias." Strain, 194 Ill. 2d at 477. The supreme court held that the trial court's question regarding gang involvement did not sufficiently explore the area of potential gang bias. The supreme court further held that the trial court had abused its discretion when it refused defense counsel's request to "probe for gang bias" during voir dire. Strain, 194 Ill. 2d at 481.

Unlike in Strain, defense counsel in the present case did not request or pose gang bias questions. Accordingly, Strain is inapposite and does not compel reversal.

Next, defendant contends that his counsel was ineffective for failing to question the prospective jurors regarding gang bias. To prevail on his claim of ineffective assistance, defendant must show that "(1) counsel's performance was so seriously deficient as to fall below an objective standard of reasonableness," and "(2) the deficient performance so prejudiced the defendant as to deny him a fair trial." People v. Mitchell, 189 Ill. 2d 312, 332 (2000), citing Strickland v. Washington, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). Defendant must prove both prongs of the Strickland test in order to show that his trial

counsel provided ineffective assistance. People v. Hooker, 253 Ill App. 3d 1075, 1082 (1993). Furthermore, a strong presumption exists that counsel's performance involved sound trial strategy. People v. Medrano, 271 Ill. App. 3d 97, 100 (1995).

On the record before us, defense counsel likely could have determined that the questioning of the prospective jurors by the trial court regarding whether they could be fair and impartial was sufficient to ensure that defendant would receive a fair trial and that he did not want to highlight the gang evidence further. Accordingly, defendant's conduct during voir dire was not objectively unreasonable.

Further, based on the evidence recounted earlier in this order, specifically the testimony of Saul Jimenez regarding the shooting, the ballistics tests, and defendant's videotaped confession, defendant cannot establish that he was prejudiced by counsel's alleged error. Accordingly, defendant's contention of ineffective assistance fails.

Next, defendant contends that the trial court erred by denying his motion to suppress his confession. Review of a motion to suppress presents both questions of law and fact. In re Christopher K., 217 Ill. 2d 348, 373 (2005). The trial court's credibility determinations and findings of fact will not be reversed unless they are against the manifest weight of the evidence. In re Christopher K., 217 Ill. 2d at 373. However, the ultimate legal question of whether the evidence should be suppressed is reviewed de novo. In re Christopher K., 217 Ill. 2d at 373.

Defendant contends his confession was involuntarily made as a result of the police holding him for 57 hours in custody without a probable cause hearing. Under the fourth amendment, a defendant arrested without a warrant is entitled to a probable cause hearing to justify any

No. 1-04-3743

prolonged detention. People v. Deloney, 359 Ill. App. 3d 458, 467 (2005). The United States Supreme Court has held that a probable cause hearing generally should be held within 48 hours of the defendant's arrest in order to pass constitutional muster. Deloney, 359 Ill. App. 3d at 467, citing County of Riverside v. McLaughlin, 500 U.S. 44, 56, 114 L. Ed. 2d 49, 63, 111 S. Ct. 1661, 1670 (1991). Where no such hearing is held within a 48-hour period, the State must show some exigence or emergency circumstances justifying the delay. McLaughlin, 500 U.S. at 57, 114 L. Ed. 2d at 63, 111 S. Ct. at 1670. However, the United States Supreme Court has prescribed no specific remedy for the State's failure to make such a showing. Deloney, 359 Ill. App. 3d at 467.

In the present case, defendant contends that the trial court should have suppressed his confession because he was detained for more than 48 hours without a probable cause hearing, and because the State showed no exigence or emergency circumstances justifying the delay. In his amended motion to suppress, defendant relied heavily on the appellate court's decision in People v. Willis, 344 Ill. App. 3d 868 (2003), which held that a statement to police by a defendant after he had been held for 73 hours without a probable cause hearing was inadmissible. However, the Illinois Supreme Court recently has reversed the appellate court opinion in Willis, holding that the admissibility of a defendant's statement hinges on whether it is voluntary, and that the defendant's prolonged detention is merely one factor to consider in determining whether an inculpatory statement was given voluntarily. People v. Willis, 215 Ill. 2d 517 (2005).

In considering whether a defendant's statement was voluntary, the court considers the totality of the circumstances surrounding it, including the defendant's age, intelligence, education,

-13-

experience, and physical condition at the time of the detention and interview; the duration of the interrogation; the presence of Miranda warnings; the presence of any physical or mental abuse; and the legality and duration of the detention. Willis, 215 Ill. 2d at 536.

In the present case, defendant was 18 years old at the time of his arrest and had eight prior arrests over the course of the last two years. Defendant was interviewed 3 times in the 57 hours prior to his first inculpatory statement. All three interviews were of short duration; the first interview lasted 15 minutes, the second interview lasted 5 to 10 minutes, and the third interview lasted 5 minutes. The police testified that he was given Miranda warnings on each occasion and that he was allowed to eat and sleep. He was not handcuffed. When interviewed by ASA Goldish, defendant said that he had been treated fine by the police and did not have any complaints.

On these facts, where defendant's time in custody was less than in Willis, where he was questioned for shorter periods of time, and where the totality of the circumstances supports the voluntariness of defendant's question, the trial court did not err in denying the motion to suppress.

Next, defendant contends that the prosecutor made two improper comments during closing arguments, one of which asserted that his testimony was a fabrication for trial, and the other asserted that defendant had the rank in his gang to order the shooting. Defendant waived review by failing to object to either comment at trial. People v. Enoch, 122 Ill. 2d 176, 186 (1988). Nor was there any plain error, where the evidence was not closely balanced and the remarks did not deprive defendant of a fair trial. People v. Herron, 215 Ill. 2d 167, 178-79 (2005).

Next, defendant contends that the trial court erred by adding 15 years to his sentence pursuant to section 5-8-1(a)(1)(d)(i) of the Unified Code of Corrections. Section 5-8-1(a)(1)(d)(i) states:

"Except as otherwise provided in the statute defining the offense, a sentence of imprisonment for a felony shall be a determinate sentence set by the court under this Section, according to the following limitations:

(1) for first degree murder,

* * *

(d)(i) if the person committed the offense while armed with a firearm, 15 years shall be added to the term of imprisonment imposed by the court[.]" 730 ILCS 5/5-8-1(a)(1)(d)(i) (West Supp. 2001).

Defendant contends that he was convicted on an accountability theory and was not personally armed with a firearm and, therefore, that he is not subject to the 15-year sentence enhancement of section 5-8-1(a)(1)(d)(i). The State argues that defendant waived review by failing to object at trial. However, defendant's argument is that the circuit court lacked the statutory authority to impose the 15-year sentence enhancement and, thus, that the 15-year sentence enhancement is void. A void order may be attacked at any time and in any court, and an argument that an order or judgment is void is not subject to waiver. People v. Thompson, 209 Ill. 2d 19, 27 (2004). Accordingly, we address the sentencing issue on the merits.

Our supreme court addressed a similar issue in People v. Sangster, 91 Ill. 2d 260 (1982). Sangster was found accountable for murder, armed robbery, and aggravated kidnapping. The trial

judge sentenced him to consecutive terms pursuant to section 5-8-4(a) of the Unified Code of Corrections, which provided in relevant part:

"The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, in which event the court may enter sentences to run consecutively."  (Emphasis added.)  Ill. Rev. Stat. 1979, ch. 38, par. 1005-8-4(a).

Sangster argued that as he was only accountable for what occurred and did not himself injure anyone, the imposition of consecutive sentences was improper.  The supreme court disagreed, noting that under principles of accountability and common design, the defendant was responsible for all acts, including the infliction of severe bodily injury, which were committed in furtherance of the common design.  Sangster, 91 Ill. 2d at 265. As defendant was legally responsible for the infliction of severe bodily injury, he was subject to the imposition of consecutive sentences under section 5-8-4(a).  Sangster, 91 Ill. 2d at 265-66.

Similarly, in the present case, defendant was found accountable for the murder of the victim.  Under principles of accountability and common design, defendant was responsible for all acts, including the commission of the offense while armed with a firearm, which was committed in furtherance of the common design.  As such, defendant was subject to the 15-year sentence enhancement of section 5-8-1(a)(1)(d)(i).

In a related argument, defendant contends that his 15-year sentence enhancement violates

No. 1-04-3743

Apprendi v. New Jersey, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). In Apprendi, the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63. Pursuant to Apprendi, the trial court here instructed the jury to determine whether, during the commission of the offense of first degree murder, defendant "or one for whose conduct he is legally responsible" was armed with a firearm. The jury answered in the affirmative, and the trial court sentenced defendant to the additional 15 years pursuant to section 5-8-1(a)(1)(d)(i).

Defendant contends that the instruction was erroneous, as he was only subject to the additional 15 years' enhancement if he himself had been armed with a firearm during the offense. Defendant contends that because of the erroneous instruction, the jury was never called upon to properly decide this issue. Defendant contends that, in order to comply with Apprendi, the jury should have been instructed to determine whether defendant was personally armed with a firearm during the offense. As discussed above, though, defendant is subject to the 15-year sentence enhancement where one for whose conduct he was legally responsible committed the offense while armed with a firearm. Accordingly, the instruction was not erroneous and there was no Apprendi violation.

Next, defendant contends that the cause must be remanded for a new Batson hearing because the trial court failed to make findings of fact following the prosecutor's race-neutral explanations for excusing two Hispanic jurors. The State contends defendant waived review by

-17-

No. 1-04-3743

failing to raise the issue in his posttrial motion. However, this court has held that where, as here, a defendant challenges the State's use of peremptory challenges during voir dire, the issue is sufficiently preserved for review even if not raised again in a posttrial motion. People v. Caine, 258 Ill. App. 3d 599 (1994). Accordingly, we address the Batson issue on the merits.

In Batson, the United States Supreme Court held that in a criminal case the fourteenth amendment's equal protection clause prohibits the State from using a peremptory challenge to exclude a prospective juror solely on the basis of his or her race. Batson, 476 U.S. at 89, 90 L. Ed. 2d at 83, 106 S. Ct. at 1719. The Batson Court provided a three-step process for evaluating claims of discrimination in jury selection. First, defendant must make a prima facie showing that the State exercised its peremptory challenge on the basis of race. People v. Easley, 192 Ill. 2d 307, 323 (2000). If the defendant makes a prima facie showing, the burden shifts to the State to articulate a race-neutral reason for excusing the venireperson. Easley, 192 Ill. 2d at 323-24. Once the State articulates its reasons for excusing the venireperson, the trial court determines whether the defendant has carried his burden of establishing purposeful discrimination. People v. Williams, 173 Ill. 2d 48, 70-71 (1996).

To establish a prima facie case of purposeful discrimination by the State in the exercise of its peremptory challenges, defendant must present relevant circumstances which raise an inference that the State challenged venirepersons on account of their race. Such relevant circumstances include: (1) the racial identity between the defendant and the excluded venirepersons; (2) a pattern of strikes against Hispanic venirepersons; (3) a disproportionate use of peremptory challenges against Hispanic venirepersons; (4) the level of Hispanic representation in the venire as compared

-18-

No. 1-04-3743

to the jury; (5) the prosecutor's questions and statements during voir dire examination and while exercising peremptory challenges; (6) whether the excluded Hispanic venirepersons were a heterogenous group sharing race as their only common characteristic; and (7) the race of the defendant, victim, and witness. Williams, 173 Ill. 2d at 71. The trial court's determination of whether a prima facie case has been shown will not be overturned unless it is against the manifest weight of the evidence. Williams, 173 Ill. 2d at 71.

In the present case, during voir dire, the following colloquy occurred:

"MR. MUNOZ [Defense Counsel]: If I may address the State's peremptory on Guadalupe Hashmi and Ruby Davila. I ask the State to give us a reason why they are having them stricken. We have a possibility of a Batson problem there because those are the only two Hispanics left on the jury and we have a Hispanic client here. I think that raises some doubt in my mind, especially unless the State has a nonracial reason for striking them. That's what I will ask.

MR. AHERN [Assistant State's Attorney]: Read the case law and figure out what the [expletive] burden is.

MR. MURPHY [Assistant State's Attorney]: Judge, are you saying there's a prima facie showing of a pattern?

MR. MUNOZ: I'm saying he struck the only two Hispanics left on there.

MR. MURPHY: How it works procedurally, the judge makes a prima facie showing of a pattern, and if so, we offer race-neutral reasons.

THE COURT: At this point, I don't believe there's a prima facie, but I

-19-

would like you to list, if you have a nonracial reason why you are bumping them.

MR. MURPHY: Both potential jurors we struck had family members charged with federal drug crimes; they's why we struck them. It had nothing to do obviously with the racial makeup. I don't want a juror serving that has a family member that's a defendant in a federal drug case.

THE COURT: All right. Let's proceed."

Thus, the only argument defendant made in support of a prima facie finding of discrimination was that the defendant and the excluded jurors shared the same race. Although this circumstance is relevant, it is not dispositive in determining whether a prima facie case exists. Williams, 173 Ill. 2d at 72.

Defendant made no arguments as to any of the remaining relevant circumstances which would raise an inference that the State challenged venirepersons on the basis of race. On this record, then, the trial court's finding that defendant failed to establish a prima facie case of purposeful discrimination by the prosecution's exercise of peremptory challenges is not against the manifest weight of the evidence.

Although the trial court found that the defendant failed to establish a prima facie case of discrimination, the court asked the State to provide race-neutral reasons for its challenges. Defendant contends that the trial court erred in failing to make explicit findings of fact following the prosecutor's race-neutral explanations for excusing the two jurors. Analysis of this issue is unnecessary, given the trial court's finding that defendant had not established a prima facie case of discrimination.

For the foregoing reasons, we affirm the circuit court.

Affirmed.

GALLAGHER and O'MARA FROSSARD, JJ's concur.